Robert L. Starr, Bar No. 183052
robert@starrlaw.com
THE LAW OFFICE OF ROBERT L. STARR, APC
23901 Calabasas Road, Suite 2072
Calabasas, California 91302
Telephone: (818) 225-9040
Facsimile: (818) 225-9042

Stephen M. Harris, Nar No. 110626
stephen@smh-legal.com
THE LAW OFFICE OF STEPHEN M. HARRIS, APC
6320 Canoga Avenue, Suite 1500
Woodland Hills, California 91367
Telephone: (818) 924-3103
Facsimile: (818) 924-3079

Attorneys for Plaintiff
KIEVA MYERS, individually, and on behalf of a class
of similarly situated individuals

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| KIEVA MYERS, individually, and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>vs.<br><br>BMW OF NORTH AMERICA, LLC,<br><br>Defendants. | CASE NO. 3:16-CV-00412-WHO<br><br>Assigned for All Purposes to<br>the Honorable William H. Orrick<br><br>Date:     3-27-19<br>Time:    2:00 p.m.<br>Courtroom: 2<br><br>**NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITES** |

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on March 27, 2019, at 2:00 p.m., or as soon thereafter as the matter may be heard in Courtroom 2 of the above-entitled Court, 17th Floor, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiff Kieva Myers ("Plaintiff" or "Myers") will and hereby do move this Court, pursuant to Federal Rule of Civil Procedure Rule 23, for an Order finally approving the class action settlement agreed to by the parties in this matter.

This Motion is based upon: (1) this Notice of Motion and Motion; (2) the attached Memorandum of Points and Authorities in Support of Motion for Final Approval of Class Action Settlement; (3) the Declaration of Stephen M. Harris ("Harris Declaration"); the declaration of Kristie Livingston, the papers filed in support of the motion for final approval of attorneys' fees, costs and enhancement; (4) the [Proposed] Order Granting Final Approval of Class Action Settlement, filed concurrently herewith; (5) the records, pleadings, and papers filed in this action; and (6) upon such other documentary and oral evidence or argument as may be presented to the Count at the hearing of this Motion.

Dated: March 12, 2019

THE LAW OFFICE OF STEPHEN M. HARRIS, P.C.

By: /s/ Stephen M. Harris
Stephen M. Harris
Attorneys for Plaintiff
KIEVA MYERS, individually, and on behalf of a class of similarly situated individuals

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Myers brings this action on behalf of a nationwide class of current and former owners and lessees of certain BMW X-5 Vehicles, with production dates from October 1, 2006 through June 30, 2013, which were distributed by defendant BMW of North America LLC ("BMW") and equipped with optional Comfort Access System. She alleges that defects in the design, manufacture, and assembly of the comfort access system in the class vehicles resulted in unintended locking of the Class Vehicles in situations where Class Members did not intend to lock the Vehicle using the key fob or Comfort Access System. (Docket, "Dkt." 68, Third Amended Complaint, ¶¶ 1,17-19.)

Plaintiff and BMW settled the nationwide class claims and the court granted preliminary approval of the settlement on September 10, 2018. As part of the settlement, BMW has agreed to reimburse all class members who have incurred certain enumerated costs in connection with spontaneous or unintended locking of their Class Vehicles. BMW's obligations are based upon the payment and reimbursement provisions of the Agreement, more fully described below and in the Agreement attached as exhibit 1. (See, Exhibit 1 to Harris Declaration). Along with the Class Notice, BMW has also provided an owner's manual insert that reminds vehicle owners, among other things, to always carry the vehicles' key fob on their person, to avoid a potential lockout situation.

Plaintiff now moves for final approval of the settlement. The settlement provides Class Members with remedies similar to what they could expect to receive if the case were successfully tried, but without the delay and risks associated with trial, and it should therefore be approved.

The claims administrator mailed notice to 876,725 potential class members, and states that there have been to date 2,514 claims which have been received. The value of these claims, assuming a claim value of $300.00, is $754,200.  (See, Livingston Declaration, attached as exhibit 2 to Harris Declaration, ¶¶ 6-10; Harris Declaration,  ¶ 33.)

Moreover, Plaintiff estimates that the total value of the settlement, when considering the potential future physical harm that will be avoided as a result of the injunctive benefit, as well as the other benefits provided by the settlement, is $11,414,200 to $31,414,200. (See, Harris Declaration, ¶¶ 32-36.) This figure includes the present and future cost of claims administration services of approximately $660,000.00. (Harris Declaration, ¶ 32; Livingston Declaration, ¶ 14.) In contrast, there have been only 43 opt-outs and 2 objections, thus establishing that the class approves the settlement of the parties. (Livingston Declaration, ¶¶ 11-12.)

## II. FACTS AND PROCEDURE

### A. *The Comfort Access Defect*

Plaintiff contends that the comfort access feature is defective. The defect is that sometimes while the remote control is located inside the Class Vehicle, the vehicle spontaneously locks (Comfort Access Defect). Plaintiff contends that this defect has been reported by numerous owners and lessees of Class Vehicles, sometimes trapping children inside the vehicles. (Third Amended Complaint, "TAC", ¶ 19.) BMW was aware of the Comfort Access Defect, as far back as 2007. (*Id.* ¶¶ 21-22.)

### B. *Named Plaintiff's Lease and Purchase of a Class Vehicle with Comfort Access Defect*

Myers purchased a used 2013 model year BMW X5 vehicle bearing VIN 5UXZW0C50D0B95201. (TAC ¶ 2.) Myers purchased the Class Vehicle in August of 2015. (*Id.*) Myers' vehicle came equipped with the Comfort Access Feature, which is described by BMW's owner's manual: "the concept [of the feature, is that] the vehicle can be accessed without activating the remote control. All you need to do is to have the remote control with you, e.g., in your pocket. The [Class] Vehicle automatically detects the remote control when it is nearby or in the passenger compartment." (*Id.* ¶ 18.) The owner's manual also states that "[in order] to lock the vehicle, the remote control must be located outside of the vehicle." (*Id*). Further, the manual states: "If a remote control is detected within the vehicle, the vehicle does not lock or is unlocked again." (*Id.*)

C. *Myers Experienced The Comfort Access Defect*

On October 19, 2015, Myers experienced the Comfort Access Defect. Myers opened the rear door of the vehicle, placed her child inside of the vehicle, placed the remote inside the vehicle, and shut the rear door of the vehicle. Next, Myers walked around to the driver's door, and attempted to open the driver's door. Prior to Myers getting to the driver's door, the vehicle locked, locking her out of the vehicle and locking her very young child inside the vehicle. Myers' child was too young to know how to open the door to the vehicle, and was trapped inside. (Myers Declaration, Dkt., No. 71-6, ¶¶ 4-5.) To rescue Myers' child, it was necessary to break one of Myers' windows, doing damage to the vehicle and terrifying Myers's child. Myers had to pay a total of $192.25 to Best Service Auto Glass to repair the window that was broken to rescue her child. Additionally, the vehicle suffered other damage during the ordeal. (*Id.*)

Following Myers' experiencing the Comfort Access Defect, a complaint was made by the Myers family to BMW regarding the October 19, 2015 occurrence. In response to this complaint, on November 4, 2015, Jay Hanson of BMW wrote an email to the Myers family. An excerpt of Mr. Hanson's email read as follows, "Therefore we must be dealing either with a malfunction of the locking system or an inadvertent activation of the locking system via either the remote transmitter or the Comfort Access System. Again, it is not impossible to lock a key in the vehicle – and to do so is not necessary indicative of a malfunction. For example, if a door other than the driver's door is open and the locking button on the transmitter is pressed, the vehicle will lock when the open door is closed. If the user is unaware of having pressed the locking button, then it would certainly appear that it had somehow locked itself." Plaintiff contends that Mr. Hanson's email completely contradicts the BMW owner's manual. (*Id.* ¶ 6; TAC, ¶ 26.)

D. *Myers and Class Members Were Not Aware of The Defect*

Prior to Myers' used Vehicle purchase, in August of 2015, Myers' husband performed very thorough research about the Myers Vehicle. The research included review of BMW's web-site regarding the Vehicle, and such third-party web-sites as, for example, Edmunds and Car and Driver. This research included research into the Comfort Access Feature, some review of the owners' manual, and review of BMW Brochures and other sales pitches regarding the Comfort Access Feature. Myers' husband discussed the research with her in detail. Despite the research, Myers was not aware of the fact that the

Vehicle could spontaneously lock with the key inside the vehicle. There was no disclosure in all the materials reviewed by Myers's husband, which were discussed with Myers, about the vehicle spontaneously locking. (TAC, ¶ 3.)

Based on the research which was performed regarding the Myers Vehicle, Myers would have been aware of a disclosure about the propensity of the vehicle to spontaneously lock while the key was inside the vehicle, if any such disclosure had been made. (*Id*.)

E.   **BMW's Knowledge of The Defect**

Plaintiff contends that BMW knew that the Class Vehicles were defective and not fit for their intended purpose of providing consumers with safe and reliable transportation. Nevertheless, BMW actively concealed and failed to disclose this defect to Myers and the Class Members at the time of purchase or lease and thereafter. (*Id*. ¶ 37-42.) Only BMW had access to information about the significant risks associated with the Comfort Access Defect, through BMW's dealerships, pre-release testing data, warranty data, customer complaint data, replacement part sales data, and training manuals, among other internal sources of aggregate information about the problem. (*Id*. ¶ 41.)

During discovery, BMW produced documents substantiating that it was aware that it was possible for the vehicle doors to be locked even though the key with the Comfort Access function was inside the vehicle. In simplistic terms, BMW's analysis shows that the Comfort Access functions with a microsecond delay during which the vehicles' doors can be unlocked and immediately relocked if the customer's hand remains on the door handle's Comfort Access sensor. This may result in a key fob placed inside the vehicle not being detected. In such circumstances, the consumer could put the key in the vehicle (or their coat or purse containing the key) and then shut the door after the door has been unlocked and relocked, thereby being locked out of the vehicle. (Harris Declaration, ¶¶ 12-13.)

Plaintiff contends that the parent company of BMW (BMW AG) recommended advising consumers that they should keep the drivers' door open while opening or closing the passenger or rear doors, or keep the remote out of the vehicle while loading it. BMW produced an internal communication to dealers about this issue, but the problem was not disclosed to customers generally. The only recommendation to dealers was to discuss the issue with consumers who had already experienced the

problem. Moreover, BMW's publicly available advice to consumers was that the vehicle cannot lock while the key with comfort access was inside the vehicle. (*Id.*)

**F.     BMW Refuses to Rectify The Problem**

BMW was advised of the damages sustained as a result of the Myers' Vehicle experiencing the Comfort Access Defect, however, BMW failed to unconditionally reimburse Myers for all of the damages that have resulted from the Comfort Access Defect. (TAC, ¶ 35.) Plaintiff understands that other consumers were similarly advised by BMW that it was not responsible for the vehicle locking as a result of the Comfort Access Defect. (*Id.*, ¶ 42, c.)

**G.     Claimed Losses**

Because of BMW's misconduct, Myers and the other owners and lessees of Class Vehicles have been harmed and have suffered actual damages. The actual damages include, but are not limited to, the Class Vehicles continuing to experience the Comfort Access Defect, and that Class Members have suffered unreimbursed out of pocket expenses because of the Comfort Access Defect. (*Id.* ¶ 36.)

**H.     The Class Action Complaint Against BMW**

On January 24, 2016, Myers brought a class action against BMW on behalf herself and a class of California consumers alleging (1) violations of California Consumer Legal Remedies Act, (2) violations of California Unfair Business Practices Act, (3) breach of implied warranty, and (4) fraud. (Dkt. No. 1.) Myers then filed a first amended complaint in April of 2016, containing the same theories of recovery. (Dkt. No. 2.) After the filing of the First Amended Complaint, BMW brought a motion to dismiss, which was opposed by Myers. The court granted the motion, with leave to amend. (Dkt. No's. 23, 31-33, 35.)

Myers then filed a Second Amended Complaint, in October of 2016. (Dkt. No. 36.) BMW again brought a motion to dismiss, which was opposed by Myers. (Dkt. No.'s 37, 38, and 39.) The court granted the motion in part, dismissing the common law fraud claim. But the court denied the motion to dismiss the UCL and CLRA claims. (Dkt. No. 40.) BMW filed its answer to the Second Amended complaint in January of 2017. (Dkt. No. 41.)

**I.     Preliminary Approval**

On February 9, 2018, Plaintiff filed her motion for preliminary approval of the class action

settlement (Dkt. No.'s 54, 55, 56, 57.) On March 28, 2018, the parties were directed to file supplemental briefing supporting the motion, and the court set a schedule for the briefs to be filed in its July of 2018 order. (Dkt. No.'s 58, 59.)

On July 23, 2018, and August 1, 2018, supplemental papers were filed by the parties supporting the motion for preliminary approval. (Dkt. No.'s 60, 63.) The court held a hearing on the motion for preliminary approval on August 29, 2018, and granted the motion for preliminary approval. A formal order was entered on September 10, 2018. (Dkt. No.'s 64, 67.) The notice to the class was revised in accordance with the court's instructions, and a third amended complaint was filed consistent with the settlement agreement of the parties. (Dkt. No.'s 65, 68.)

The court certified the Settlement Class as defined in its Order and the Agreement, appointed Plaintiff as the Class Representative, appointed Stephen M. Harris and Robert L. Starr as Class Counsel, and found that the settlement terms were, at least preliminarily, sufficiently fair, reasonable and adequate so as to justify dissemination of notice to class members. (Dkt. No.'s 64, 67.)

### J.   *Investigation And Discovery*

Plaintiff conducted a pre-filing and post-filing investigation, including, but not limited to, retaining expert consultants regarding the Comfort Access Defect, review of publicly available information relating to the nature and extent of the Comfort Access Defect, review of on-line complaints and NHTSA complaints, review of lawsuits filed in Southern California relating to this problem, review of literature about the dangers posed to children locked in parked cars, and obtaining and reviewing approximately 3,500 pages of documents produced by BMW in response to Plaintiff's formal discovery requests, including warranty and good will claims data, call center records, and customer complaint records. The investigation and discovery revealed other instances of consumers locking their keys inside class vehicles, other complaints relating to children being unintentionally locked inside class vehicles, a complaint by a parent being cut by class when the vehicle window was smashed to rescue a child, and other medical reports about children being lethargic as a result of being locked inside class vehicles. (Harris Declaration, ¶¶ 24-27.)

Plaintiff further propounded written discovery, and received written responses thereto. Plaintiff's

counsel also travelled to New Jersey and conducted four depositions of BMW witnesses over several days, with the witnesses produced in response to Plaintiff's person most knowledgeable deposition notice. (*Id.*, ¶ 28.)

Class counsel also answered telephone and email inquiries from Class Members. Class Counsel responded to the email inquiries of Class Members. These inquiries included issues relating to claim documentation, eligibility, the amount of the claim, and applicable deadlines. We also anticipate being involved in responding to deficiency letters, and curing of deficiencies. The vast majority of the class members who contacted Class Counsel offered positive input about the settlement, and also stated that they had experienced being locked out of their vehicles. (*Id.* at ¶¶ 16-21.)

### K. The Settlement Agreement

The parties had discussed resolution of the case early in the litigation, but could not agree on the terms of a comprehensive class action settlement. After the depositions of BMW's witnesses in New Jersey, the parties renewed their discussions and were able to reach a resolution of all issues. The parties first agreed on all aspects of the settlement (other than attorneys' fees, costs, and enhancement) including agreement to a nationwide class for settlement purposes only. Subsequently, the parties negotiated the attorneys' fees, costs, and the enhancement amount. A formal Settlement Agreement was then prepared and executed by all parties in December of 2017. (*Id.*, ¶¶ 29-31.) Thereafter, the parties negotiated the notice and claim form. (*Id.* at ¶ 31.)

### L. The Settlement

#### 1. The Settlement Class

The settlement class consists of "all residents in the United States (including Puerto Rico), who currently own or lease or previously owned or leased, a Class Vehicle" ("Settlement Class"). (Agreement, § I, ¶ 10).) Excluded from the Settlement Class are the following: "(1) BMW NA, its related entities, parent companies, subsidiaries and affiliates, and their respective officers, directors, and employees; (2) insurers of the Class Vehicles; (3) all persons and/or entities claiming to be subrogated to the rights of Class Members; (4) issuers or providers of extended vehicle warranties or extended service contracts; (5) individuals and/or entities who validly and timely opt-out of the Settlement; (6) consumers or businesses

8
FINAL APPROVAL MOTION

that have purchased Class Vehicles previously deemed a total loss (i.e. salvage) (subject to verification through Carfax or other means); (7) current and former owners of a Class Vehicle who previously have released their claims against BMW NA with respect to the issues raised in the Litigation; (8) United States and Puerto Rico residents who have purchased Class Vehicles in the United States but have since transported the vehicle outside the United States for permanent use abroad; (9) any current or former owner or lessee of a Class Vehicle that has received or obtained a goodwill or warranty payment for Out-Of-Pocket costs(s) (unless the consumer had to pay or share in some portion of the Out-Of-Pocket Cost, in which case the unreimbursed portion of such cost is not excluded); (10) any judge to whom this matter is assigned, and his or her immediate family (spouse, domestic partner, or children); (11) individual or entities that have purchased and/or leased Class Vehicles as "fleet" vehicles (i.e. rentals or company vehicles); and (12) Class Vehicles that were involved in accidents that resulted in damage to the Comfort Access System or related components." (*Id*.)

### 2. The Payment and Reimbursement Schedule

BMW's agrees to pay for "emergency out of pocket costs", meaning costs incurred in connection with a Spontaneous or Unintended Locking in which a child and/or pet was locked inside a Class Vehicle, up to a maximum of $650.00, consisting of $150 maximum reimbursement for "non-emergency" out of pocket costs, and up to $500 for "emergency out of pocket costs." In Spontaneous or Unintended Lockout situations, BMW agrees to pay for "non-emergency" out of pocket costs, up to a maximum reimbursement limit of $150.00. (Agreement, § I, ¶¶ 21, 26, 27 and § III).)

Emergency out of pocket costs include the costs to repair a broken window, or other damage, arising out of the effort to unlock a Class Vehicle, as well as other related costs such as towing, or rental vehicle costs. (*Id.*, § I, ¶¶ 21, 26, and 27.) And non-emergency costs include obtaining the cost of a locksmith or other similar services, as well as towing and rental costs. (*Id.*)

### 3. The Owners' Manual Insert

The Class Notice included an owner's manual insert which is attached as part of exhibit A to the Livingston Declaration. The notice provides additional information and warnings regarding potential locking of Class Vehicle doors using the Comfort Access System. This is a vital part of the Settlement,

notifying Class Members of the lock-out concern in order to avert potential harm to children and other vulnerable individuals. (*Id.*, § I, ¶ 31, § III, A; Harris Declaration, ¶¶ 17-21, 33-36, and Exhibit A to Livingston Declaration.)

### 4. The Notice to the Class

Rust Consulting was appointed as the Settlement Administrator and transmitted the notice of the Settlement and is handling all claims administration duties. (Livingston Declaration, ¶¶ 1-14, and Exhibits A-C, attached thereto; Agreement §I, ¶¶ 14, 28, 31;§ V). Notice was sent by First-Class U.S. Mail, postage paid, to potential Settlement Class members, including current and prior owners and lessees of Class Vehicles. The procedure for giving notice to potential Settlement Class members is set forth in Section I, Paragraph 28 and Section IV, paragraphs A-E, of the Agreement. In addition to mail notice, the settlement administrator maintains a toll free number and web site dedicated to advising Class Members about the Settlement. (*Id*; Livingston Declaration, ¶¶ 1-14, and Exhibits A-C, attached thereto.)

Class members had 90 days to submit a claim from the date of transmission of the notice, and can do so via mail, email, or facsimile. (Agreement, § I, ¶¶ 9, 28; §§ IV-V; Exhibit A to Livingston Declaration.) Class members can also appeal denial of their claims, or cure deficient claims. (Agreement, § V, ¶¶ D, F-G.) The claim deadline is presently April 8, 2019. (Livingston Declaration, ¶ 10.)

The Settlement Agreement, at Section VI, establishes the procedure for those potential Settlement Class members who wish to be excluded from the settlement; Section VII establishes the procedure for those potential Settlement Class members who wish to object to the settlement.

### 5. The Release of the Class

Class Members who did not opt out of the Settlement according to the procedures set forth in the Settlement Agreement shall release any and all claims (including unknown claims) or causes of action that were, or could have been, asserted by Plaintiff or any Class Members against BMW, regarding spontaneous or inadvertent locking of the doors due to the Comfort Access System in Class Vehicles as alleged in the Action (excluding potential claims for personal injury, or claims for subrogation). (Agreement, § VIII.)

6. **Claims Administration/Notice**

The claims administrator mailed notice to 876,725 potential class members, and states that there have been to date 2,514 claims which have been received. The value of these claims, assuming a claim value of $300.00, is $754,200. (See, Livingston Declaration, ¶¶ 6-10; Harris Declaration, ¶ 33.) Moreover, we estimate that the total value of the settlement is $11,414,200 to $31,414,200, including anticipated future claims, deficiencies which are cured, and potential future loss of life averted by virtue of the notice. (See, Harris Declaration, ¶¶ 32-36.) This figure includes the present and future cost of claims administration services of approximately $660,000.00. (Harris Declaration, ¶ 32; Livingston Declaration, ¶ 14.) In contrast, there have been only 43 opt-outs and 2 objections, thus establishing that the class approves the settlement of the parties. (Livingston Declaration, ¶¶ 11-12.)

////

////

////

////

////

////

////

////

The claims administrator maintained a web site and toll-free number as provided for in the Agreement, (See, Livingston Declaration, ¶¶ 6-14.) There were 770 calls and 5,439 unique visits to the claims administrator web site. (*Id.* at ¶ 14.) Plaintiff also hired a vendor (David Sorrendino) to create an informational web-site about the settlement. Mr. Sorrendino used search optimization, structured use of key words, blogs, social media communications and other devices to alert class members about the settlement and its benefits. This included posting on BMW enthusiast sites, and ads which generated 15,000 impressions. Mr. Sorrendino also made claim forms available for Class Members to download on Plaintiff's site and a limited number class members downloaded claim forms on the web site created by Plaintiff. Class counsel reviewed and approved all the communications created by Sorrendino. (Harris Declaration, ¶ 15.)

## III.
## ARGUMENT

**A.     *The Court Should Approve The Settlement As Fair, Reasonable And Adequate***

To approve a class action settlement under Federal Rule Civil Procedure 23(e), the Court must find that the settlement is "fair, reasonable, and adequate," recognizing that "it is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." (*Staton v. Boeing*, 327 F.3d 938, 960 (9th Cir. 2003) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir.1998). "[T]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable, and adequate to all concerned." (*Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982).)

In evaluating the fairness of the settlement, the Court should balance "the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class

action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a government participant, and the reaction of the class members to the proposed settlement." (*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1291 (9th Cir. 1992) (quoting *Officers for Justice*, 688 F.2d at 625.).)

The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claims advanced, the types of relief sought, and the unique facts and circumstances of each case. (*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 526 (C.D. Cal. 2004) (citing *Officers for Justice*, 688 F.2d at 625).)

In affirming the settlement approved by the trial court in *Class Plaintiffs*, the Ninth Circuit noted that it "need not reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." (*Class Plaintiffs*, 955 F.2d at 1291 (internal quotation and citation omitted).)

Where, as here, the settlement is the product of arm's length negotiations conducted by capable counsel with extensive experience in complex class action litigation, the court begins its analysis with a presumption that the settlement is fair and should be approved. (See 4 NEWBERG ON CLASS ACTIONS (4th ed.) § 11.41.) As discussed in greater detail below, the settlement presented here is entitled to a presumption of fairness. First, the settlement was reached only after extensive arm's-length negotiations. (See Harris Declaration, ¶¶ 29-31, 37-39.)

Thus, there is no indication of collusion.

Second, Class Counsel and counsel for BMW are experienced in class action litigation, acted in good faith, and represented their clients' best interests in reaching the settlement. (*Id.*, and See, e.g., Dkt., No.'s 71-2, ¶ 15; 71-5, ¶ 7.) In addition, Plaintiff supports the settlement, which also supports approval, as shown below.

**B.     *The Settlement and The Benefits It Provides Warrant Final Approval***

Here, class members receive reimbursement for out of pocket expenses, based on the reimbursement formula of the settlement for out of pocket expenses incurred. (Harris Declaration, ¶¶ 14,

38.) A vehicle normally is eligible for warranty coverage for four years or 50,000 miles. The settlement provides benefits without regard to such limitations. Moreover, class members have been notified of the lock-out problem, which is the most valuable benefit of the settlement given the risk to human life posed by a young child being locked inside a vehicle. (Harris Declaration, ¶¶ 16-21, 32-36.)

The settlement compares favorably with results achieved in other cases. (Cf. *Daniel v. Ford Motor Co.*, No. 11-cv-2890, 2013 WL 3146810, at *6 (E.D. Cal. June 18 2013) (denying class certification in suspension defect case); see also *Samuel-Bassett v. Kia Motors America, Inc.*, 34 A.3d 1 (Penn. 2011) (nearly 12 years after the commencement of the action, the Supreme Court of Pennsylvania ultimately affirmed award for brake repairs.[1])

What is more, the claims process here allows Settlement Class members to obtain these benefits by completing a simple form and providing basic documentation, without requiring Settlement Class members to meet the full evidentiary burdens they could face in individual litigation or in a claims process following a successful class trial. This factor therefore strongly supports settlement approval. (*Hopson v. Hanesbrand Inc.*, 2009 WL 928133 at *8 (N.D. Cal. 2009) (holding that benefits of settlement supported approval where recovery "appear[ed] to be a reasonable compromise").

C.     **The Risks Inherent In Continued Litigation And Trial Support Final Approval**

The relief available to Class Members meets and exceeds the fair, reasonable and adequate standard of Rule 23. This is especially true since Defendant vigorously disputed Plaintiff's claims and there was a significant risk of non-recovery or a recovery substantially less than the benefits afforded Class Members under this Settlement. By settling now, rather than proceeding to trial, Class Members will not have to wait (possibly years) for their relief, have received notice that they should keep the key on their person at all times, and will not have to bear the risk that class certification is denied or that Defendant prevails at trial. There are significant risks associated with any case seeking class-wide relief.

---

[1] See also *Henderson v. Volvo Cars a/North America*, Case No. 09-4146-CCCJAD (D.N. 2012), Docket No. 71-1 (settlement agreement) § III.A (providing 8 year/100,000 mile extended warranty and reimbursement of either 50% for original owners and lessees, or 25% for all other class members, for out-of-pocket costs for allegedly defective automatic transmissions.)

While Plaintiff has confidence in her claims, BMW has raised a number of substantive defenses, including, among others, a defense that BMW had no duty to disclose the defect to consumers, and that Plaintiff cannot prove the alleged defect is safety related. (See Dkt. No. 41 and *Daugherty v. American Honda Motor Co.*, 144 Cal. App. 4th 824 (Cal. Ct. App. 2006)); Harris Declaration, ¶ 39.) The settlement eliminates any potential risk of non-recovery if BMW were to prevail on these defenses. (*Browning v. Yahoo!, Inc.*, No. 04-cv-1463, 2007 WL 4105971, at * 14 (N.D. Cal. Nov. 16, 2007) (holding that "legal uncertainties at the time of settlement-particularly those which go to fundamental legal issues-favor approval").)

If the parties had been unable to resolve this case through settlement, the continued litigation would have been expensive and lengthy, requiring significant and costly involvement from expert witnesses. (Harris Declaration, ¶¶ 37-39; see *Hanlon*, 150 F.3d at 1025 (holding that district court should evaluate the settlement in light of "the risk, expense, complexity, and likely duration of further litigation").) The settlement, by contrast, provides immediate relief. This factor thus also supports approval. (*Id.*; *Browning*, 2007 WL 4105971 at * 10 (holding that settlement approval was proper where "further litigation before this Court would be time consuming, complex, and expensive").

Indeed, a brief survey of the outcomes of recent automobile defect class actions underscores the enormous risks attendant to such an undertaking. (See, e.g: *Daugherty v. American Honda Motor Co.*, 144 Cal.App: 4th 824 (2006), (affirming judgment of dismissal on demurrer); *In Re General Motors Dex-Cool Products Liability Litigation*, 241 F.R.D. 305 (S.D. Ill. 2007) (nationwide class certification denied in a case involving defective intake manifold gaskets; class counsel ultimately achieved a nationwide settlement after spending 58,500 hours and $1.55 million in litigation costs to certify state classes in three state courts and prepare those cases for trial); *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1019 (7th Cir. 2002) (nationwide class certification denied in Ford Explorer roll-over litigation, which ultimately settled for coupons after 7 years of litigation, including a 50-day bench trial in California state court); *Edwards v. Ford Motor Co.*, 2012 WL 2866424 (S.D. Cal. June 12, 2012) (certification denied under

California law in automobile defect case).[2])

Therefore, the relief offered in the Settlement—especially when measured against the potential weaknesses of Class Members' claims, the risk that the Class would not be certified for trial, and the time and expense that would be required to proceed through trial—is highly beneficial to the Class and provides a strong basis for final approval.

### D. The Settlement Eliminates The Risk of Decertification Or Other Challenge to Class Action Status Through Trial

The settlement eliminates any risk that further discovery might raise manageability concerns that would cause the Court to reevaluate class certification. This factor also weighs in favor of approval of the settlement. (*Browning*, 2007 WL 4105971 at * 11 (holding that settlement approval was proper where there was a risk that settlement approval might not be maintained through trial.))

Plaintiff's Counsel believes that this case is appropriate for class certification in the litigation context. However, BMW would strongly oppose class certification were the case to proceed. "The value of a class action depends largely on the certification of the class, and…class certification undeniably represents a serious risk for plaintiffs in any class action lawsuit." (*Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 392 (C.D. Cal. 2007) (quoting *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig*., 55 F.3d 768 (3d. Cr. 1995)).)

In addition, there is always a risk that a Court would not find this action suitable for certification as a nationwide class or a multi-state class. (See, e.g., *Mazza v. American Honda Motor Co*., 666 F.3d 581 (9th Cir. 2012) (the Ninth Circuit reversed the certification of a nationwide class composed of consumers seeking remedies under California's consumer protection laws); *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011); see, also *In Re. Hyundai and Kia Fuel Economy Litigation*, No. 15-56014, Dkt. No. 136 (granting review of decision applying *Mazza* analysis to nationwide settlements.)

---

[2] See, also, *Samuel-Bassett v. Kia Motors America, Inc*., 34 A.3d 1 (Penn. Dec 2, 2011) (nearly 12 years after the commencement of the action following, among other things, a contested motion for class certification, trial, post-trial motions, and appeal to the Superior Court, the Supreme Court of Pennsylvania affirmed an award of $600 to each class member which was based on the class vehicle having a useful life of 100,000 miles).

Moreover, as noted above, many recent plaintiffs have not succeeded on class certification motions. Even if class certification were granted, this ruling can always be reviewed or modified before trial, and a class may be decertified at any time. (See, e.g., *American Honda Motor Co., Inc. v. Superior Court*, 199 Cal. App. 4th 1367 (2011) (reversing class certification under California law in case involving transmission defect); *Marcus v. BMW of N. Am., LLC*, 2012 WL 3171560 (3d Cir. Aug.7, 2012) (reversing certification of consumer class action case involving BMW vehicles equipped with allegedly defective run flat tires).)

The fact that Plaintiff secured the benefits for Class Members in the Agreement, consisting essentially of reimbursement of out of pocket loss and notification of the risk of lock-outs, is especially significant given these obstacles.

**E.    *The Extent of Discovery And The Stage of the Proceedings Favor Settlement Approval***

Plaintiff in this litigation has undertaken an extensive investigation, analysis, and discovery, so that Plaintiff and Class Counsel had adequate information with which to evaluate their claims. (Harris Declaration ¶¶ 5-16, 24-28, 33-39.)

Plaintiff reviewed voluminous documents, conducted pre-filing investigation, and consulted and retained experts. Plaintiff also had extensive contact with class members subsequent to the settlement. (*Id.*) All parties had a fair opportunity to assess the strengths and weaknesses of their respective positions. The stage of proceedings therefore also favors settlement approval. (*Browning*, 2007 WL 4105971, at * 11-12 (holding that stage of proceedings weighed in favor of approval where parties were "well positioned to assess the strength of this case and the comparative benefits of the proposed settlement").)

**F.    *The Recommendations of Experienced Counsel Favor Approval Of the Settlement***

Class counsel, highly experienced in class-action and automobile product defect litigation, view this as an excellent settlement. (Harris Declaration, ¶¶ 37-39; Dkt., No.'s 71-2, ¶ 15; 71-5, ¶ 7; see *Hartless v. Clorox Co.*, 273 F.R.D. 630 (S.D. 2011) ("The recommendations of counsel are given great weight since they are most familiar with the facts of the underlying litigation.")

**G.     No Attorneys General Object**

Notice of the settlement was provided to the Attorney General of the United States and the Attorneys General of each state in which a Settlement Class member resides, as required by the Class Action Fairness Act, 28 U.S.C. §1715. (Docket, No. 57-1.) No Attorneys General object to the settlement and this factor therefore also favors approval. (*Browning*, 2007 WL 41059'71 at * 12 (holding that where governmental agencies were given notice of the settlement and did not object, factor weighed in favor of settlement.))

**H.     Class Members' Positive Reaction Warrants Final Approval**

The Representative Plaintiff supports the settlement. (See, declaration of Plaintiff.) Of the over 800,000 class members notified of the settlement, only 43, an infinitesimal percentage, have opted out. Only two objections to the settlement have been made. (Livingston Declaration., ¶¶ 6-11.) The reaction of the class demonstrates that the overwhelming majority of the class supports the settlement, weighing in favor of approval. (See *Hanlon*, 150 F.3d at 1027 ("[T]he fact that the overwhelming majority of the class willingly approved the offer and stayed in the class presents at least some objective positive commentary as to its fairness"); *In re Netflix Privacy Litig.*, No. 11-cv-00379, 2013 WL 1120801, at *8 (N.D. Cal. March 18, 2013) (holding that low rates of opt-outs and objections weighed in favor of settlement approval).)

The reality is that any case against a major automotive manufacturer alleging a defect in thousands of vehicles has the potential to take up significant amounts of the Court's and the parties' resources. In addition, if the case were to proceed, Plaintiff would need to retain multiple experts resulting in significant additional expenses.

Given the favorable terms of the settlement and the rigorous manner in which these terms were negotiated, the proposed settlement is a fair, reasonable and adequate compromise of the issues in dispute and merits final approval.

## IV. CONCLUSION

The parties have negotiated a fair and reasonable settlement that almost certainly never would

have been arrived at but for the use of a class action as a procedural device, a dedicated and informed Class Representative and experienced Plaintiff's counsel. Final Approval should thus be granted.

Dated:  March 12, 2019

THE LAW OFFICE OF STEPHEN M. HARRIS, P.C.

By: /s/ Stephen M. Harris
Stephen M. Harris
Attorneys for Plaintiff
KIEVA MYERS, individually, and on behalf of a class of similarly situated individuals