Robert L. Starr, Bar No. 183052
robert@starrlaw.com
THE LAW OFFICE OF ROBERT L. STARR, APC
23901 Calabasas Road, Suite 2072
Calabasas, California 91302
Telephone: (818) 225-9040
Facsimile: (818) 225-9042

Stephen M. Harris, Nar No. 110626
stephen@smh-legal.com
THE LAW OFFICE OF STEPHEN M. HARRIS, APC
6320 Canoga Avenue, Suite 1500
Woodland Hills, California 91367
Telephone: (818) 924-3103
Facsimile: (818) 924-3079

Attorneys for Plaintiff
KIEVA MYERS, individually, and on behalf of a class of similarly situated individuals

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| KIEVA MYERS, individually, and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>vs.<br><br>BMW OF NORTH AMERICA, LLC,<br><br>Defendants. | CASE NO. 3:16-CV-00412-WHO<br><br>Assigned for All Purposes to the Honorable William H. Orrick<br><br>Date:      3-27-19<br>Time:      2:00 p.m.<br>Courtroom: 2<br><br>**DECLARATION OF STEPHEN M. HARRIS IN SUPPORT OF PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |

# DECLARATION OF STEPHEN M. HARRIS

I, Stephen M. Harris, hereby declare as follows:

1. I am the president and sole shareholder of the law offices of Stephen M. Harris, P.C., and I am admitted to practice law in the United States District Court of the Northern District of California and in the State of California. I am one of the attorneys of record for Plaintiff Kieva Myers ("Representative Plaintiff" or "Myers") and the proposed Settlement Class in the above-entitled action. I have personal knowledge of the matters set forth herein, except as to those matters stated on information and belief, and as to those matters, I believe them to be true. If called upon as a witness to testify upon the matters stated herein, I would be competent to do so.

2. I make this declaration in support of Plaintiff's Motion for Final Approval of Class Action Settlement ("Motion").

3. A true and correct copy of the Agreement is attached hereto as exhibit 1. A true and correct copy of the declaration of Kristie Livingston ("Livingston Declaration") is attached hereto as exhibit 2. True and correct copies of the Notice to the Class, Claim Form and Owners' Manual insert are attached to the Livingston Declaration as Exhibit A. A true and correct copy of the list of the 48 class members who excluded themselves from the settlement is attached to the Livingston Declaration as exhibit B. A true and correct copy of the court's preliminary approval order is attached as exhibit 3.

## PROCEDURAL HISTORY

5. On January 24, 2016, Myers brought a class action against BMW on behalf herself and a class of California consumers alleging (1) violations of California Consumer Legal Remedies Act, (2) violations of California Unfair Business Practices Act, (3) breach of implied warranty, and (4) fraud. (Dkt. No. 1.) Myers then filed a first amended complaint in April of 2016, containing the same theories of recovery. (Dkt. No. 2.) After the filing of the First Amended Complaint, BMW brought a motion to dismiss, which was opposed by Myers. The court granted the motion, with leave to amend. (Dkt. No's. 23, 31-33, 35.)

6. Myers then filed a Second Amended Complaint, in October of 2016. (Dkt. No. 36.) BMW again brought a motion to dismiss, which was opposed by Myers. (Dkt. No.'s 37, 38, and

39.) The court granted the motion in part, dismissing the common law fraud claim. But the court denied the motion to dismiss the UCL and CLRA claims. (Dkt. No. 40.) BMW filed its answer to the Second Amended Complaint in January of 2017. (Dkt. No. 41.)

7. On February 9, 2018, Plaintiff filed her motion for preliminary approval of the class action settlement. (Dkt. No.'s 54, 55, 56, 57.) On March 28, 2018, the parties were directed to file supplemental briefing supporting the motion, and the court set a schedule for the briefs to be filed in its July of 2018 order. (Dkt. No.'s 58, 59.)

8. On July 23, 2018, and August 1, 2018, supplemental papers were filed by the parties supporting the motion for preliminary approval. (Dkt. No.'s 60, 63.) The court held a hearing on the motion for preliminary approval on August 29, 2018, and granted the motion for preliminary approval. A formal order was entered on September 10, 2018. (Dkt. No.'s 64, 67.)

9. The notice to the class was revised in accordance with the court's instructions, and a third amended complaint was filed consistent with the settlement agreement of the parties. (Dkt. No.'s 65, 68.)

10. Discovery in this matter has shown that 219,233 Class Vehicles were sold throughout the United States, including Puerto Rico. The Livingston Declaration states that 876,725 current or former owners (which includes lessees) were sent notification of the settlement. (See, Paragraph 4, Livingston Declaration.)

11. The Class Vehicles consist of BMW of North America, LLC ("BMW") X-5 vehicles, with a production date from October of 2006 through June of 2013, which were distributed by BMW and equipped with an optional Comfort Access System.

12. Plaintiff contends that the comfort access feature is defective. The defect is that sometimes while the remote control is located inside the Class Vehicle, the vehicle spontaneously locks (Comfort Access Defect). This situation has been reported by numerous owners and lessees of Class Vehicles, sometimes trapping children inside the vehicles. The factual basis for these allegations is more fully described in the accompanying motion.

13. BMW did not dispute that it is possible to lock the key with the accompanying Comfort Access System in the vehicle, but instead produced documents contending that it is possible to

lock the door (or re-lock the door) while it is open. In simplistic terms, BMW's analysis shows that the Comfort Access functions with a microsecond delay during which the vehicles' doors can be unlocked and immediately relocked if the customer's hand remains on the door handle's Comfort Access sensor. This may result in a key fob placed inside the vehicle not being detected. In such circumstances, the consumer could put the key in the vehicle (or their coat or purse containing the key) and then shut the door after the door has been unlocked and relocked, thereby being locked out of the vehicle. Plaintiff contends that this was due to a software error in the Comfort Access System. Plaintiff contends that the parent company of BMW (BMW AG) recommended advising consumers that they should keep the drivers' door open while opening or closing the passenger or rear doors, or keep the remote out of the vehicle while loading it. BMW communicated this information to its dealers, but Myers contends the problem was not properly disclosed to customers generally. The only recommendation to dealers was to discuss the issue with consumers who had already experienced the problem. Moreover, BMW's publicly available advice to consumers was that the vehicle cannot lock while the key with comfort access was inside the vehicle.

14. Plaintiff and BMW have reached a settlement of nationwide class claims subject to final approval by this Court. BMW has agreed to reimburse all class members who have, or will, incur costs in connection with Spontaneous or Unintended locking of Class Vehicles. In cases where a child and/or pet was locked inside a Class Vehicle (an "Emergency Lock Out"), the reimbursement limit is $650.00, while in cases where only personal property was locked inside a vehicle the reimbursement limit is $150.00 (a "Non-Emergency Lock Out").

**CLASS COUNSEL DISCOVERY AND INVESTIGATION**

15. The claims administrator maintained a web site and toll-free number as provided for in the Agreement, (See, Livingston Declaration, ¶¶ 6-14). The claims administrator received 770 calls and there were 5,439 unique visits to the claims administrator web site. (*Id.* at ¶ 14.) Plaintiff also hired a vendor (David Sorrendino) to create an informational web-site about the settlement. Mr. Sorrendino used search optimization, structured use of key words, blogs, social media communications and other devices to alert class members about the settlement and its

benefits. This included posting on BMW enthusiast sites, and ads which generated 15,000 impressions. Mr. Sorrendino also made claim forms available for Class Members to download on Plaintiff's site and a limited number of class members downloaded claim forms on the web site created by Plaintiff. Class counsel reviewed and approved all the communications created by Sorrendino.

16. Class counsel also answered telephone and email inquiries from Class Members. Class Counsel responded to the email inquiries of Class Members. These inquiries included issues relating to claim documentation, eligibility, the amount of the claim, and applicable deadlines. We also anticipate being involved in responding to deficiency letters, and curing of deficiencies.

17. The vast majority of the class members who contacted Class Counsel offered positive input about the settlement, and also stated that they had experienced being locked out of their vehicles. Not all these individuals had incurred out of pocket expenses. For example, Laurie McCorvie stated that that she was twice locked out of her class vehicle due to the Comfort Access defect. Suzanne Kennedy was locked out of her vehicle after placing her bags and purse in the back-seating and shutting the door. Stacey Adams related that she was locked out after putting her purse and briefcase on the passenger side and closing the door. Laura Atwood experienced being locked out on two separate occasions.

18. Further, Holly Boone experienced an unintended locking incident with a young infant being locked in the vehicle. David Bell's child was locked in his X-5 vehicle in October of 2017. Phil Dixon reports that: "We had this happen to our x5, where it locked our child in the vehicle." Margarita Jerden states that she sustained emotional stress due to multiple lockouts, stating in part that "…my son has been locked in the car on 3 SEPARATE occasions with the latest one occurring in the summer of 2018."

19. Tony Wadsworth also states that his infant child was locked in the X-5 vehicle. Judy Johnson experienced a lockout during the first week of her new job. Rosie Kelly relates that an inadvertent lock-out was experienced by her and that "goats" were occupants of the vehicle when the inadvertent lock-out occurred.

19. Molly Koch reports that she was locked out of her X-5 vehicle, stating in part: "I

4
HARRIS DECLARATION

received some paperwork about the class action settlement regarding my BMW X5. I have had the keys lock in my car with my two small children in car seats several times. Fortunately every time it has happened I have been in my driveway or had access to my spare key fob."

20. Misty Maier-Distad did not incur any out of pocket expenses, but her infant child was locked in her vehicle. She stated: "My infant was in the car and I had to call 911 for the fire department to get the door open since I live in Hawaii and it was a really hot day- I didn't have time to wait on a locksmith as my daughter could have overheated quickly."

21. Further, Nina Parker states that she has been locked out of her vehicle on three occasions. In one instance, her one year old child was locked in the vehicle: "Last year in the summer I endured what was the most terrifying experience as a mother. After having eaten dinner on a warmer summer day I placed my child in my BMW X5 2013 vehicle. I placed her diaper bag in the vehicle as well that at the time had my key fob inside. I closed the door and at that time to [sic] car locked. I could not access the vehicle and my child was locked inside the already hot car. For 20 minutes we tried to figure out how to get my daughter out. We contacted the police but they did not have the capability to open the vehicle. The restaurant was only 5 minutes away from my home so a good Samaritan ran me home so I could get the spare key. We got it and I was able to unlock the car and get my daughter out. She was only 1 year old at the time. Paramedics arrived and made sure was not overheated or anything and luckily she was fine. I contacted BMW and they kept my car for about a week and said they found nothing wrong that if I pressed the button while in the car that the car would default to locking."

21. Thus, class counsel communicated with the above Class Members and other Class Members regarding their experience with the Comfort Access Defect.

22. In addition to responding to class member inquiries, Class Counsel also communicated with the claims administrator, Rust Consulting, on behalf of the Class Members, and communicated with defense counsel regarding settlement issues.

23. The claim deadline is April 8, 2019, and thus Class Counsel anticipates further communications with class members relating to their potential and actual claims. Finally, we will continue to communicate with class members, the claims administrator and BMW

1 after final approval, relating to rectifying notices of deficiency, and appealing denial of claims.

2     24. Plaintiff conducted a pre-filing and post-filing investigation, including, but not limited
3 to, retaining expert consultants regarding the Comfort Access Defect, review of publicly available
4 information relating to the nature and extent of the Comfort Access Defect, review of on-line
5 complaints and NHTSA complaints, review of lawsuits filed in Southern California relating to this
6 problem, review of literature about the dangers posed to children locked in parked cars, and
7 obtaining and reviewing approximately 3,500 pages of documents produced by BMW in response
8 to Plaintiff's formal discovery requests, including warranty and good will claims data, call center
9 records, and customer complaint records. The investigation and discovery revealed other instances
10 of consumers locking their keys inside class vehicles, other complaints relating to children being
11 unintentionally locked inside class vehicles, a complaint by a parent being cut by class when the
12 vehicle window was smashed to rescue a child, and other medical reports about children being
13 lethargic as a result of being locked inside class vehicles.

14     25. One of the expert consultants (Timothy Saurwein) conducted an inspection of
15 Plaintiff's vehicle in July of 2016, and the comfort access system, and prepared a report of the
16 inspection. He also assisted with preparing class counsel to depose BMW's witnesses.

17     26. Class counsel also consulted Sean Kane of Safety Research & Strategies, Inc. Safety
18 Research conducted a detailed analysis of marketing materials, incident reports, BMW documents,
19 and the Comfort Access System, to analyze the reasons for failure of the Comfort Access System
20 to appropriately perform. Safety Research noted that the owners' manual states that "that when a
21 remote is in the car it won't lock. But the service description indicates that the remote
22 (i.e., transmitter) is disabled until it is unlocked again – which seems to say the vehicle is
23 locking with the transmitter inside the vehicle."

24     27. Safety Research concluded its report as follows: "There appear to be multiple issues
25 that may result in lock failure and scenarios that can entrap occupants…"

26     28. Plaintiff further propounded written discovery to BMW, and received written responses
27 thereto. Plaintiff's counsel also travelled to New Jersey and conducted four depositions of BMW
28 witnesses over several days, with the witnesses produced in response to Plaintiff's person most

knowledgeable deposition notice.

**CASE RESOLUTION**

29. Although the parties scheduled a mediation, they ultimately were able to agree on all aspects of the settlement (other than attorneys' fees, costs, and the enhancement) without the need for a mediation. The parties had discussed resolution of the case early in the litigation, but could not agree on the terms of a comprehensive class action settlement. After the depositions of BMW's witnesses in New Jersey, the parties renewed their discussions and were able to reach a resolution of all issues. One of the key factors prompting a resolution, it appeared to Plaintiff, was that BMW was aware of a safety issue relating to the ability of Class Members to lock the keys inside their Class Vehicles, but had not notified consumers of this problem.

30. As stated above, the parties first agreed on all aspects of the settlement (other than attorneys' fees, costs, and enhancement) including agreement to a nationwide class for settlement purposes only. Subsequently, the parties negotiated the attorneys' fees, costs, and the enhancement amount. Plaintiff's counsel has a fee division agreement, including with the referring attorney Joseph Santoli, Esq., which has been disclosed to the client and which the client has consented to.

31. A formal Settlement Agreement was prepared and executed by all parties in December of 2017. Thereafter, the parties negotiated the notice and claim form. The parties also agreed to the language of a formal document to be sent to Class Members, advising them of the potential of being locked out of a Class Vehicle, which has been sent to them as an Owners' Manual Insert.

**CLAIMS ADMINISTRATION DATA/CASE VALUE**

32. The Livingston Declaration states that claims administration costs are currently estimated to be $660,000.00. The Livingston Declaration also establishes that there are 2,514 Claim Forms to date. We have not received any information about the average value of these claims to date. There have been 770 calls received by the claims administrator and 5,439 unique visitors to the web site maintained by the claims administrator.

33. If the 2,514 claims average $300.00 per claim, the value of claims made to date equates to $754,200. If the value of claims average $150.00, then the value of claims to date is $377,100.

However, Plaintiff considers the monetary relief afforded by the settlement to be truly incidental to the injunctive or declaratory relief granted by the settlement. That the primary thrust of the case focuses on injunctive or declaratory relief, as opposed to a monetary recovery, is manifested by the benefits of the injunctive or declaratory relief. The class has been notified of the potential lock-out problem, thereby substantially reducing the likelihood of serious personal injury or death of young children. See, https://noheatstroke.org/, discussing the 794 children who have died due to vehicular heatstroke since 1998; https://www.cdc.gov/disasters/extremeheat/children.html, discussing the risk of leaving children alone in a car, and noting that the temperatures inside a car can rise by twenty degrees within the first ten minutes; and https://www.safelite.com/resource-center/car-safety/vehicular-heatstroke?utm_medium=paid_social&utm_source=twitter&utm_campaign=safety&utm_content=vehicular_heastroke&dclid=CPOiotTfiNQCFcR1YgodoXEMnw discussing risk of vehicular heat-stroke in children, and noting that a child's body overheats 3-5 times faster than an adult's body. Thus, the estimated $660,000 spent on claims administration expenses to date is well worth the cost in order to avoid potential loss of life.

34. Representative wrongful deaths verdicts involving young children assist in determining the value of the injunctive relief in this case. Attached hereto as exhibit 4 is a true and correct copy of a report of a wrongful death verdict for $20,000,000.00, involving the death of a 15 year old struck by a car at a dangerous crossing. Attached hereto as exhibit 5 is a true and correct copy of a $10,000,000.00 verdict involving a wrongful death case relating to a three year old boy who was strangled by a wheelchair harness. Attached hereto as exhibit 6 is a verdict report of a $5,000,000.00 verdict involving the death of a nine year old. Attached hereto as exhibit 7 is a true and correct copy of a report of a verdict of approximately $8,000,000.00, involving the death of a child who choked after consuming a gel snack. Attached hereto as exhibit 8 is a true and correct copy of a verdict report in a wrongful death action involving a 15 year old girl who died as a result of the overdoes of the drug Propofol. The verdict was for over $80,000,000.00.

35. Attached as exhibit 9 is a true and correct copy of a wrongful death verdict arising out of the death of a ten year old child. The amount of the verdict was $30,000,000.00. Attached

1  hereto as exhibit 10 is a true and correct copy of a $34,000,000.00 verdict in a wrongful death case
2  involving a nine year old boy whose death resulted from a blaze caused by an air conditioning
3  unit.
4      36. We contend that the notice to the class, advising them to keep the Comfort Access Key
5  on their person at all times, has an incalculable value in this case. The verdict reports addressed
6  above support that if the notice averted just one death, the value of that harm avoided ranges from
7  $10,000,000.00 to $30,000,000.00.

**THE SETTLEMENT IS FAIR AND REASONABLE**

9      37. After thorough research, investigation, and evaluation of the claims, the parties
10 engaged in arm's length, good faith settlement negotiations. Counsel for Defendant and Plaintiff's
11 counsel participated in lengthy, serious, and informed negotiations, before the Settlement that is
12 now placed before this Court for preliminary approval was reached.
13     38. Based on the negotiations and a detailed knowledge of the issues present in this action,
14 I am convinced that this settlement is in the best interests of the Class Members. For example,
15 discovery and investigation has revealed that BMW's warranty normally extends only to four
16 years or 50,000 miles, whichever comes first.  Here, the Settlement permits class members to
17 obtain reimbursement for out of pocket payments for costs incurred in connection with
18 Spontaneous or Unintended locking of Class Vehicles, without any such limitations for eligible
19 lockout events up to the class notice. Also, given the nature of the costs incurred in connection
20 with such an event, the reimbursement limits of  $650.00 or $150.00, depending on the
21 circumstances of the lock out, are reasonable. The settlement also notifies Class Members of the
22 potential for a lock-out, as reflected by the notice to owners included as part of exhibit A to the
23 Livingston Declaration. This is a vital part of the Settlement, notifying Class Members of the lock-
24 out concern order to avert potential harm to children and other vulnerable individuals.
25     39. I have balanced the terms of the proposed settlement, including both the benefits
26 conferred to the Plaintiff and Class Members by the settlement, against the probability of
27 obtaining class certification, liability and the range of recovery issues at trial. The risks of trial and
28 other normal perils of litigation, including the affirmative defenses asserted by BMW, difficulties

1  of complex litigation, including the fact that Plaintiff's motion for certification would have been
2  vigorously contested (including any effort to obtain nationwide certification), lengthy process of
3  establishing specific damages, and various possible delays and appeals were also carefully
4  considered by class counsel in agreeing to the proposed settlement.
5        40. Since the settlement is fair, reasonable and in the best interests of class members, it
6  should be approved.
7         I declare under penalty of perjury under the laws of the United States that the foregoing
8  is true and correct and that this declaration was executed on March 13, 2019 in Woodland Hills,
9  California.

          /s/ Stephen M. Harris
              Stephen M. Harris