**EXHIBIT 4**

# JURY VERDICT ALERT .com (S)

## 15-year-old dies after being struck by car at dangerous crossing on way to school bus. $20 million. San Bernardino County.

## Summary

School district hides evidence of its negligence in selection of bus stop locations and is sanctioned by court before trial. Later argues value of adopted son's death.

## The Case

**Case Name:** Jong Ja Jun v. Chaffey Joint Union High School District and Imelda Hughes

**Court and Case Number:** San Bernardino Superior Court / CIVDS1112258

**Date of Verdict or Judgment:** Thursday, July 30, 2015

**Date Action was Filed:** Monday, October 24, 2011

**Type of Action:** Dangerous Condition Public Property (/jury-verdicts/category/dangerous-condition-public-property/), Wrongful Death (/jury-verdicts/category/wrongful-death/)

**Judge or Arbitrator(s):** Hon. Brian S. McCarville

**Plaintiffs:**
Ja Jun, biological aunt and adoptive mother of decedent.

**Defendants:**
Chaffey Joint Union High School District
Imelda Hughes

**Type of Result:** Jury Verdict.

## The Result

**Gross Verdict or Award:** $20,500,000

**Award as to each Defendant:**
The jury found the School District 100 percent responsible for the damages.

**Non-Economic Damages:**
The jury awarded Jin's mother $4,500,000 in past non-economic damages and $16,000,000 in future non-economic damages, for a total verdict of $20.5 million.

**Trial or Arbitration Time:** 23 days.

**Jury Deliberation Time:** 4 hours.

**Jury Polls:** 12-0 past noneconomic; 11-1 future noneconomic; 11-1 100% fault to school district.

## The Attorneys

**Attorney for the Plaintiff:**
Panish, Shea & Boyle, LLP by Rahul Ravipudi, Deborah Chang, Thomas A. Schultz, and Matthew Stumpf, Los Angeles.

**Attorney for the Defendant:**
McCune & Harber, LLP by Stephen M. Harber, Los Angeles. (For Chaffey Joint Union High School District).
Calendo Puckett Sheedy, LLP by Christopher M. Sheedy, Glendale. (For Imelda Hughes).

**Plaintiff's Technical Expert(s):**
Augustine C. Zembia, busing, San Diego.
Edward Stevens, traffic engineering, Olympia, WA.
**Defendant's Technical Expert(s):**
David Roseman, traffic engineering, Long Beach.

## Facts and Background

**Facts and Background:**
On the morning of Dec. 6, 2010, plaintiff's decedent and adopted son, Jin Ouk Burnham, 15, a sophomore high school student, was attempting to cross Duncan Canyon Road, an uncontrolled five lane highway with east-west traffic, and Serrano Avenue, with north-south traffic, towards a bus stop in the City of Fontana, on a bus route established by the School District. The bus stop was the only one near Jin's home. While crossing Duncan Canyon Road in an unmarked crosswalk at Serrano Avenue, Jin was struck by a vehicle, operated by Imelda Hughes. Jin suffered catastrophic injuries and passed away 15 days later.

Plaintiff, Jong Ja Jun, Jin's adoptive mother, sued the Chaffey Joint Union High School District, the City of Fontana, the State of California, Hughes and the People of the State of California. The State of California was dismissed before trial commenced. The Court dismissed the case against the City of Fontana on summary judgment and settled the matter with plaintiff.

When trial commenced, the only defendants were Chaffey Joint Union High School District and Imelda Hughes.

**Plaintiff's Contentions:**
Plaintiff contended that the District was responsible because in the year prior to Jin's death, they had bus stops on both sides of Duncan Canyon Road so that children did not have to cross Duncan Canyon Road to get to a school bus stop. However, at the start of the 2010 school year, plaintiff contended that the District removed the stop on the south corner of Duncan Canyon Road and Serrano which required Jin and others to cross Duncan Canyon Road to get to the stop on the Northeast Corner. The traffic on Duncan Canyon Road traveled at freeway speeds averaging 56 miles per hour with a top speed of 71 miles per hour. Plaintiff contended this was illegal in violation of 13 California Code of Regulation 1238(b)(3) and consequently constituted a dangerous condition of public property.

By the time of trial (see notes), the court found that defendant School District had created a dangerous condition which was a cause of Jim's death. At trial, the school district disputed the value of the loss of the relationship between Jin and his mother, arguing that the jury should award plaintiff only $1,500,000. The District further suggested that the jury find Mrs. Hughes 50% at fault and use its discretion in apportioning the remaining fault between Jin and the District.

**Defendant's Contentions:**
The District denied all of the allegations. Throughout the pendency of the litigation prior to trial, the District contended that it routinely at year end discards all of its bus stop designation materials and, therefore, produced no relevant documents in discovery. Through its employees, the District denied every single one of plaintiff's allegations claiming that it never removed any bus stops, that its bus stops were in effect for years with no prior incidents, that the bus stop at issue was not in violation of 13 CCR 1238(b)(3) because the bus did not stop on a multi-lane highway, but further up a cross street which had traffic controls. In addition, the District employees claimed there was a stop in effect closer to Jin's home on the south side of Duncan Canyon so that Jin did not need to cross Duncan Canyon to get to the subject stop. Finally, the District contended that both the driver, Ms. Hughes, and Jin were the sole negligent and responsible causes of Jin's death.

## Injuries and Other Damages

**Death; loss of society.**
Jin was in a coma for 15 days as a result of the significant trauma to his head and body. He ultimately succumbed to his injuries on December 21, 2015.

Jong Ja Jun was Jin's biological aunt. Mrs. Jun and Jin lived with Jong's fiance James Lee, whom Jin referred to as his Uncle. Mrs. Jun legally adopted Jin in August of 2009, a little more than a year before he died. Mrs. Jun was 54 years old when she adopted Jin. Mrs. Jun sought recovery for wrongful death damages for the loss of her only child.

## Additional Notes

While the District and citizens who were outraged and concerned following Jin's injuries – before he died – and who had written correspondence with the District requesting that it cure the dangerous condition and reinstate the south side bus stop. All of the correspondence was collected and the District's defense was under scrutiny by the parties and, at the start of trial, by the Court.

The newly acquired evidence supported the contentions by plaintiff that the school bus stop that the School District claimed Jin could have used, was not designated until after his death, and that the School District had hidden this fact. With this evidence, plaintiff brought a pre-trial motion for sanctions. The Court found the absence of evidence questionable and ordered that the District produce witnesses for an investigative hearing and testimony. During that inquiry by plaintiff's counsel, it was clear that thousands of pages of documents were withheld. The following day, the District produced some of those documents which included emails between risk management at the District and its employees which confirmed that the District knew of its role in the tragedy and every single defense it raised throughout the four years of litigation were false. The Court found, by clear and convincing evidence, that the School District did hide all evidence it dangerously designated bus stops in violation of 13 California Code of Regulation Section 1238 in the hopes of avoiding responsibility and liability. The Court then levied issue sanctions finding that the District created a dangerous condition of public property which was a cause of Jin's death.

Tweet  Like 0

(http://www.juryverdictalert.com/)

Print (/jury-verdicts/item/wrongful-death/15-year-old-struck-by-car-at-dangerous-crossing-on-way-to-school-bus-dies-20-million-san-bernardino-county?print=1&tmpl=component)

## Disclaimer

This is not an official court document. While the publisher believes the information to be accurate, the publisher does not guarantee it and the reader is advised not to rely upon it without consulting the official court documents or the attorneys of record in this matter who are listed above.

© Copyright 2018 by Neubauer & Associates, Inc. All rights reserved. www.juryverdictalert.com



**EXHIBIT 5**

**JURY VERDICT ALERT** .com (/)

| Home (/) | Recent Verdicts (/jury-verdicts/frontpage/) | Search Verdicts (/search-verdicts) | About (/about) |

| Subscribe (/subscribe) | Attorney Services (/professional-directory/frontpage/) |

| Report A Verdict (/jury-verdicts/verdictsubmissions/submit-a-verdict/product) | Contact (/contact-us) |

# $10 million verdict when wheelchair harness strangles disabled boy on school bus. Orange County.

## Summary

School bus driver improperly secures disabled child into wheelchair on bus; shoulder harness strangles the boy who suffered from Angelman Syndrome and could not move or cry out for help.
Defendant, before admitting liability and causation on eve of trial, had sought an offset of $3.7 million based on the future medical cost plaintiff parents would not incur owing to their child's early death.

## The Case

Case Name: Cisler v. Capistrano Unified School District
Court and Case Number: Orange County Superior/ 30-2011-00498422
Date of Verdict or Judgment: Thursday, December 06, 2012
Date Action was Filed: Monday, August 08, 2011
Type of Action: Wrongful Death (/jury-verdicts/category/wrongful-death/)
Judge or Arbitrator(s): Hon. Geoffrey Glass
Plaintiffs:
Melissa and Daniel Cisler, parents of decedent child
Defendants:
Capistrano Unified School District

## The Result

Gross Verdict or Award: $10,000,000
Non-Economic Damages:
$2,000,000 to each parent for past non-economic damages
$3,000,000 to each parent for future non-economic damages
Trial or Arbitration Time: 2 days
Jury Deliberation Time: 1 1/2 days
Jury Polls: 12-0

## The Attorneys

Attorney for the Plaintiff:
Panish Shea & Boyle LLP by Brian J. Panish, Thomas A. Schultz, and Erika Contreras, Los Angeles
Attorney for the Defendant:
Woodruff Spradlin & Smart by Daniel Spradlin, Costa Mesa

## Facts and Background

Facts and Background:
Kevin Cisler, age 3 and a special-needs/disabled child, died during a school-bus ride home in a Capistrano Unified School District bus. Kevin was strapped into his wheelchair by the bus driver. He died while in the bus.

Plaintiffs' intervention through the Capistrano Unified School District. At the time of his death, Kevin was not mobile and not verbal.

Kevin was plaintiffs' only child at the time of his death.

**Plaintiff's Contentions:**

That negligence by defendant school district caused the wrongful death of plaintiffs' three-year-old son. That after being improperly strapped into his wheelchair, he was left unsupervised and unmonitored by defendant's employee, a bus driver, for over 40 minutes. The Orange County coroner concluded that Kevin died as a result of positional asphyxiation, by which he literally hung to death on his wheelchair chest harness.

Plaintiffs Melissa and Daniel Cisler brought a wrongful death claim against the Capistrano Unified School District.

**Defendant's Contentions:**

Defendant school district denied liability and causation for approximately 18 months. Defendant contended until the eve of trial that Kevin Cisler's pre-existing disability caused his death.

At trial, defendant admitted liability and causation, arguing only damages.

# Injuries and Other Damages

Loss of love, comfort, affection, society and moral support of plaintiffs' three-year-old son.

# Demands and Offers

**Plaintiff §998 Demand: $7,000,000**
**Defendant §998 Offer: $1,000,000**
**Defendant Final Offer before Trial: $1,500,000**

# Additional Notes

Per plaintiff counsel:

Only after depositions that uncovered gross negligence did defendant admit liability and causation.

Before admitting liability and causation, defendant retained seven experts to contest plaintiffs' claimed non-economic damages. Defendant made two primary assertions.

First, they sought a $3.7 million dollar offset against plaintiffs' non-economic damages for the future cost of Kevin's medical care which, the defendant claimed, the parents were saved from as a result of defendant's negligence.

Additionally, a psychiatric expert was hired to opine that the plaintiff parents' lingering emotional issues were really unresolved feelings of conflict over his pre-existing disability.

Ultimately, after each of the defendant's seven experts were deposed, defendants chose not to present these arguments and witnesses at trial.

Tweet    Like 0

(http://jvdpv/jvdpv/jvdpv/jvdpv/pk.com/)

Print (/jury-verdicts/item/wrongful-death/cisler-v-capistrano-unified-school-district?print=1&tmpl=component)

# Disclaimer

This is not an official court document. While the publisher believes the information to be accurate, the publisher does not guarantee it and the reader is advised not to rely upon it without consulting the official court documents or the attorneys of record in this matter who are listed above.

© Copyright 2018 by Neubauer & Associates, Inc. All rights reserved. www.juryverdictalert.com

**EXHIBIT 6**

13 Trials Digest 3d 28, 1998 WL 933248 (Cal.Superior) (Verdict and Settlement Summary)

Copyright (c) 2012 Thomson Reuters/West
Superior Court, Los Angeles County, California.

Rodriguez vs. Arrow Truck Leasing

**TOPIC:**
Synopsis: Out-of-control big rig overturns onto vehicle, killing a rear seat passenger

Case Type: Vehicle Negligence; Motor Vehicle v. Motor Vehicle; Miscellaneous; Vehicle Negligence; Excessive Speed; Vehicle Negligence; Trailer; Wrongful Death; Minor; Course and Scope of Employment

DOCKET NUMBER: BC148524

STATE: California
COUNTY: Los Angeles

Verdict/Judgment Date: September 4, 1998

JUDGE: Victoria G. Chaney
**ATTORNEYS:**
Plaintiff: Stanley K. Jacobs, Jacobs, Jacobs & Rosenberg, Los Angeles.
Defendant: Eugene F. West, West & Miyamoto, Camarillo.

**SUMMARY:**

Verdict/Judgment: Plaintiff

Verdict/Judgment Amount: $5,000,000

Range: $5,000,000-$999,999,999
Trial Type: Jury

Trial Length: 9 days.

Deliberations: 3 hours.

Jury Poll: 12-0.

**TEXT:**

**CASE INFORMATION**

**FACTS/CONTENTIONS**
According to Plaintiff: The nine-year-old decedent, Ashley Rodriguez, was a passenger in the rear seat of a vehicle crushed by an out-of-control tractor-trailer loaded with 45,000 pounds of sodium sulfate. The plaintiff was decedent's 35-year-old father, Paul Rodriguez, a single father raising three children (decedent and her eight-year-old sister and five-year-old brother). The defendant was Arrow Truck Leasing.

The accident occurred on March 8, 1996. The driver of the tractor-trailer entered a curve at an excessive speed and lost control of the rig, crossing into oncoming traffic and overturning onto the vehicle in which Ashley Rodriguez was a passenger. Plaintiff alleged that the driver of the tractor-trailer was negligent by driving at an excessive speed and that he violated various provisions of the Vehicle Code.

## CLAIMED INJURIES

According to Plaintiff: Death of nine-year-old daughter.

## CLAIMED DAMAGES

According to Plaintiff: Loss of love, companionship, comfort, affection, society, solace and moral support.

## SETTLEMENT DISCUSSIONS

According to Plaintiff: Demand: $1,250,000 (CCP 998). Offer: $675,000 on eve of trial.

## COMMENTS

According to Plaintiff: Defendant admitted liability before trial. The trial proceeded on damages only. Plaintiff suggested $3 million to $5 million. Defendant settled with the divorced mother for $150,000 long before trial. Defendant argued for a $300,000 to $400,000 range.

This wrongful death case was consolidated with the personal injury case of a minor arising from the same accident (Horta v. Arrow Truck Leasing, Vol. 3, 13 Trials Digest 27). The jury awarded $1,115,000 in the personal injury case. The deliberation time was for both cases. Both cases were tried by a husband-wife team. Plaintiff's counsel reported that defendant's motions for new trial/remittitur on both cases were denied by the trial judge on October 27, 1998. Costs of $2,646 were awarded to plaintiff in the wrongful death case and plaintiff was also awarded prejudgment interest in the sum of $684,932 based upon defendant's failure to accept his statutory offer of settlement served on April 22, 1997. Plaintiff's counsel further reported that the $5 million verdict for Paul Rodriguez is the largest such verdict rendered in California for the death of a minor child. Moreover, previous verdicts in the $2 million to $2.5 million range were rendered to two parents rather than to a single parent like Paul Rodriguez.

Trials Digest, A Thomson/West business
Los Angeles County Superior Court/Downtown

---

End of Document                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT 7**

1 of 1 DOCUMENT

**YVONNE ENRILE, et al., Plaintiffs and Appellants, v. SHENG HSIANG JEN FOODS CO., LTD., et al., Defendants and Respondents.**

H026982

COURT OF APPEAL OF CALIFORNIA, SIXTH APPELLATE DISTRICT

2004 Cal. App. Unpub. LEXIS 10183

November 8, 2004, Filed

NOTICE: [*1] NOT TO BE PUBLISHED IN OFFICIAL REPORTS. CALIFORNIA RULES OF COURT, RULE 977(a), PROHIBIT COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY RULE 977(B). THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF RULE 977.

PRIOR HISTORY: Superior Court of Santa Clara County, No. CV784959.

JUDGES: BAMATTRE-MANOUKIAN, J.; ELIA, ACTING P.J., MCADAMS, J. concurred.

OPINIONBY: BAMATTRE-MANOUKIAN

OPINION:

**OPINION:**

Plaintiffs and appellants Yvonne, Gil, Sarah, and Stephanie Enrile (plaintiffs) appeal from a judgment on special verdict awarding them a combined total of $8,694,033.91 in damages on their third amended complaint against defendants Sheng Hsiang Jen Foods Ltd., a Taiwanese company, Yao-Peng Kuo, and Chih-Cheng Kuo (defendants). Plaintiffs argue that the trial court erred in deducting $8,000,000, the entire amount of pretrial settlements with other defendants, from the jury's special verdict of $16,694,033.91, as only that amount of the pretrial settlements attributable to economic damages should have been deducted. We disagree, and therefore af?rm.

**BACKGROUND**

Plaintiffs' third amended [*2] complaint for damages, ?led April 12, 2002, against defendants and others n1 alleged causes of action for strict products liability, failure to warn, negligence, breach of warranties, wrongful death, and intentional and negligent in?iction of emotional distress. The facts underlying the allegations are as follows. Defendants designed, manufactured, packaged, and assembled a product called Lychee Flavor Mini Gel Snack (the gel snacks). New Choice Food, Inc., distributed the gel snacks in California. In early April 1999, a member of plaintiffs' family purchased a package of the gel snacks from Marina Foods, Inc. in San Jose. Decedent Michelle Enrile attempted to eat one of the gel snacks on April 10, 1999, but it became lodged in her windpipe, causing anoxia, severe brain damage, and ultimately death on July 30, 2001. n2 At the time, plaintiffs did not know of the dangerous and unhealthful condition of the gel snacks.

> n1 The other named defendants were New Choice Food, Inc., a California corporation; Marina Foods, Inc., a California corporation; and Does 1 through 50.

> n2 Decedent was nine years old at the time of the choking incident.

[*3]

Yao-Peng Kuo and Chih-Cheng Kuo were substituted in for Doe defendants on June 3, 2002.

Before trial, plaintiffs entered into written settlement agreements with three parties, LHC Enterprises, Inc., n3 New Choice Food, Inc., and Marina Foods, Inc., for a total of $8,000,000. n4 None of the settlement agreements apportioned

the settlement between economic and noneconomic damages. The trial court found that each settlement had been entered in good faith pursuant to Code of Civil Procedure section 877.6. n5

> n3 There is no indication in the record of when LHC Enterprises, Inc. became a named defendant, or what their role in the chain of distribution was.

> n4 These settlements actually occurred before decedent's death, and thus before the third amended complaint was ?led.

> n5 "A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor . . . from any further claims against the settling tortfeasor . . . for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault." (Code Civ. Proc., § 877.6, subd. (c).)

**[*4]**

Trial began on April 28, 2003. On May 12, 2003, the jury returned a special verdict. The jury speci?cally found that (1) there was a defect in the design of the gel snacks; (2) one of the gel snacks was involved in the choking incident of April 10, 1999; (3) the defect existed when the product left the possession of defendants; (4) the defect was a cause of the injury to decedent; (5) decedent's injury was caused by a use of the product that was reasonably foreseeable by defendants; (6) defendants were negligent; (7) defendants' negligence was a cause of injury to decedent and plaintiffs; (8) there was comparative fault on the part of decedent or her parents (Yvonne and Gil Enrile); (9) the comparative fault was not a contributing cause of decedent's injury; (10) plaintiffs were present when decedent chocked on the gel snacks; (11) plaintiffs were then aware that the incident caused the injury to decedent; (12) as a result, plaintiffs suffered serious emotional distress. The jury found the total amount of damages suffered by plaintiffs and caused by the gel snacks to be $16,694,033.91; $16,000,000 of this total was noneconomic damages.

At the trial court's request, on May 30, 2003, plaintiffs [*5] ?led a motion to determine offset credits based on the prior settlements. Plaintiffs argued in part that any offset for pretrial settlements applied only to the jury's award of economic damages, that the amount of the offset was limited to the portion of the settlement attributable to economic damages, and that the same ratio determined in the jury's awards for economic and noneconomic damages applied to the settlement proceeds. Since the economic damages awarded by the jury was 4.15 percent of its total award of damages, plaintiffs claimed that the proper offset in the case was $317,475, or 4.15 percent of the pretrial settlements.

On or about May 30, 2003, defendants ?led their brief regarding setoffs. Defendants argued that in products liability cases a defendant manufacturer is entitled to a setoff in the amount of all settlements with other defendants within the chain of distribution. They further argued that Proposition 51 (Civ. Code §§ 1431.1 et seq.) did not apply. Defendants thus requested that the court allocate the entire $8,000,000 of the pretrial settlements toward the special verdict. In a response brief ?led June 13, 2003, plaintiffs argued that, contrary to defendants' [*6] claim, Proposition 51 applies to products liability cases.

At a hearing on July 14, 2003, the trial court told plaintiffs that the formula they used to allocate between economic and noneconomic damages is inapplicable to a products liability case when there is one defective product, as everybody in the chain of distribution is jointly and severally liable. Thus, once anybody other than the manufacturer pays, the manufacturer gets a credit. "And the reason they are going to get credit is because the people below weren't at fault, they were being held responsible in order to allow the plaintiff, to make sure they got the recovery. The plaintiffs can't recover twice." Plaintiffs argued that because they also got a verdict of negligence, "a wholly different tort" than products liability, allocation was appropriate. The court disagreed, stating, "I see your, quote, verdict of negligence as being exactly the same as your product liability case." However, it allowed the parties to ?le additional briefs on the issue of whether the offset would be different if "people within the chain are independently, actively negligent."

After the parties ?led additional brie?ng, a further hearing [*7] was held on August 29, 2003. At the hearing, plaintiffs conceded that if the court was not going to allocate between economic and noneconomic damages, then all of the prior settlement amounts should be offset against the jury's special verdict. The court ?led its order after hearing the same day. Relevant here the court stated in part that "strict products liability is imposed on all persons in a chain of distribution without regard to fault. The act or omission of one person in the chain is imputed by operation of law to all others in the chain. Any such defendant is not necessarily a tortfeasor, but rather an involuntary surety or guarantor. Those persons will

be liable for all economic and noneconomic damages sustained by a plaintiff, because the foundation for liability is not fault at all but rather the social policy imposing such liability. [P] It follows that pretrial settlements paid by defendants in the chain of distribution must offset a verdict against another defendant in the chain of distribution without allocation between economic and noneconomic damages." The court ordered defendants to prepare a judgment consistent with its order.

The judgment on special verdict [*8] was ? led January 14, 2004, and notice of entry of the judgment was sent the same day. The judgment states in part that, "Defendants are entitled to an offset without regard to whether a settlement or portion thereof was for economic damages or noneconomic damages." The jury's verdict of $16,694,033.91 was thus reduced by the entire amount of the pretrial settlements of $8,000,000, and plaintiffs were awarded a combined total of $8,694,033.91 in damages. Plaintiffs ? led a timely notice of appeal from the judgment on special verdict.

## DISCUSSION

Plaintiffs argue that defendants are not entitled to credit for the entire amount of the pretrial settlements, but for only those amounts of the settlements attributable to economic damages. We acknowledge that in cases where defendants are jointly liable for economic damages and severally liable for noneconomic damages, all settlement proceeds must be apportioned between economic and noneconomic damages, which correspond to the relationship that the jury award attributes to economic and noneconomic damages. (*Espinoza v. Machonga* (1992) 9 Cal.App.4th 268, 276–277.) But the rule does not apply in a strict product [*9] liability case in which plaintiffs' injuries are caused by a single defective product and all defendants are within the chain of distribution.

"Where a defective or dangerous product causes personal injury, death or product damage to a foreseeable user or consumer, one who is engaged in the business of manufacturing or selling products for use or consumption and who placed the defective or dangerous product on the market, knowing it was to be used without inspection for defects, will be held strictly liable in tort. [Citations.]" (*Pierson v. Sharp Memorial Hospital, Inc.* (1989) 216 Cal. App. 3d 340, 343, 264 Cal. Rptr. 673; see also *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 560.) A defect in either design or manufacturing may subject the manufacturer to strict liability. (*Brown v. Superior Court* (1988) 44 Cal.3d 1049, 1057, 245 Cal. Rptr. 412.) The doctrine of strict liability also applies to those who are involved in the commercial chain of distribution of the offending product. (See, e.g., *Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256, 262–263, 37 Cal. Rptr. 896; *Peterson v. Superior Court* (1995) 10 Cal.4th 1185, 1199.) [*10] "The purpose of imposing strict liability is to ensure the costs of injuries resulting from defective products are placed on the manufacturer and others who place the product on the market rather than on injured persons who are powerless to protect themselves. [Citation.]" (*San Diego Hospital Assn. v. Superior Court* (1994) 30 Cal.App.4th 8, 15–16.)

Before 1978, "every defendant found somewhat responsible for an indivisible injury, no matter how slight his or her fault, was liable for all the damages incurred by the victim. An injured person could unilaterally choose which of several concurrent tortfeasors to sue, based on their ability to pay. Generally, one singled out for suit could not join other responsible parties, and the target defendant's right to contribution or indemnity from other concurrent tortfeasors was sharply restricted. [Citations.]" [Citation.]" (*Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 625 (*Wimberly*).) In *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, 604–607, 146 Cal. Rptr. 182, "the court ameliorated the harshness of the joint and several rule by holding a defendant [*11] in a personal injury action could join other concurrent tortfeasors in the action in order to allocate proportionate responsibility, or could later seek equitable indemnity. [Citation.]" (*Wimberly, supra,* 56 Cal.App.4th at p. 625, fn. 4.)

"In 1986 the voters modi?ed this joint and several liability system with the passage of Proposition 51. The heart of the measure provides: 'In any action for personal injury, property damage, or wrongful death, *based on principles of comparative fault,* the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount.' . . ." (Civ. Code, § 1431.2, subd. (a).) [P] Proposition 51 neither refers to strict liability nor de?nes 'fault' or 'comparative' fault." (*Wimberly, supra,* 56 Cal.App.4th at p. 626; italics added; fn. omitted.)

"As discussed [above], the only 'fault' required to ?nd a defendant liable for injuries [*12] caused by a defective product is its participation in the chain of distribution. Plaintiffs suing in strict product liability therefore name such defendants even though they bear little 'fault' because they are held fully responsible for damages caused by a defective product as a matter of public policy." (*Wimberly, supra,* 56 Cal.App.4th at p. 626.) "Where, as here, the plaintiff's injuries

were caused *solely* by a defective product and the only parties among whom 'fault' can be apportioned under Proposition 51 are in its chain of distribution . . . the potential reduction or elimination of a plaintiff's recovery for noneconomic damages through apportionment of 'fault' would reallocate the risks accompanying use of defective products and utterly defeat the principal policy reasons for the adoption of strict product liability." (*Id.* at p. 632.)

"The retention of 'joint and several liability' of parties in a defective product's chain of distribution for the plaintiff's full damages without a showing of negligence is essential to the theory of strict product liability. Nothing in Proposition 51 compels dilution of the strict liability doctrine. [*13] To the contrary, the measure disapproves of joint and several liability for plaintiff's noneconomic damages only where there are 'independently acting tortfeasors who have some fault to compare.' [Citation.] The parties in a defective product's chain of distribution are not joint tortfeasors in the traditional sense; rather, as a matter of law their liability to plaintiff is coextensive with others who may have greater 'fault,' as in other instances of statutorily or judicially imposed vicarious, imputed or derivative liability. [P] Accordingly, we hold Proposition 51 has no application in a strict product liability case where, as here, the plaintiff's injuries are caused solely by a defective product." (*Wimberly, supra,* 56 Cal.App.4th at p. 633; accord, *Springmeyer v. Ford Motor Co.* (1998) 60 Cal.App.4th 1541, 1575–1576; see also *Arena v. Owens–Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178, 1196–1198.)

"Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable [*14] for the same tort," "it shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is greater." (Code Civ. Proc., § 877, subd. (a).) As Proposition 51 has no application in a strict product liability case where, as here, plaintiffs' injuries were caused solely by a defective product (*Wimberly, supra,* 56 Cal.App.4th at p. 633), pretrial settlements paid by other defendants in the chain of distribution must offset the verdict against defendants here without allocation between economic and noneconomic damages. (See *Bay Development Ltd. v. Superior Court* (1990) 50 Cal.3d 1012, 1018, 269 Cal. Rptr. 720 [pursuant to Code Civ. Proc., § 877, subd. (a), a nonsettling defendant's liability is reduced by the amount of pretrial settlements].)

Plaintiffs seek to distinguish their case from *Wimberly,* arguing that because defendants here were found liable in negligence as well as in strict liability, defendants should not get credit for amounts allocated [*15] to noneconomic damages. However, the jury's strict liability ?nding made all defendants liable for noneconomic damages without regard to fault. The jury's additional ?nding of negligence cannot be used to preclude the settlement sums paid toward noneconomic damages from offsetting the jury's verdict. This is not a case where the jury found negligence but not strict product liability, and we need not address setoffs for pretrial settlements in such a case.

The trial court did not err by ordering the jury verdict offset by $8,000,000, the entire amount of the pretrial settlements by other defendants in the chain of distribution.

## DISPOSITION

The judgment is af?rmed.

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

ELIA, ACTING P.J.

MCADAMS, J.

**EXHIBIT 8**

Source: Legal > States Legal - U.S. > Texas > Jury Instructions & Verdicts > $ TX Jury Verdicts & Settlements,
    Combined 🔲
Terms: martin columbia hospital death  (Edit Search)

⌐Select for FOCUS™ or Delivery

☐

COPYRIGHT 2001 NLP IP Company -- American Lawyer Media. All rights reserved,
VerdictSearch Texas Reporter

COPYRIGHT 2001 NLP IP Company -- American Lawyer Media. All rights reserved
VerdictSearch Texas Reporter

Brenda **Martin** and Wayne **Martin,** Individually and as a Representative of the Estate of
Rachael **Martin,** Deceased vs. Children's Advanced Medical Institutes, P.A., d/b/a PediApex
Associates; **Columbia** Hos

#### Verdict Date: 10/23/2000

**Topic:** Medical Malpractice - Wrongful **Death** - Medical Malpractice - Survival - Malice -
Products

**Result:** Defendant doctors settled before trial for $ 3,000,000. The Defendant Zeneca settled
for a confidential amount prior to trial. The **Hospital** was the only Defendant left in the suit
at the time of trial. Jury found negligence on the part of Defendants Drs. Pryor, Matson,
Papo, and the Defendant **Hospital.** Negligence was apportioned: 15% on Robert Pryor, M.D.;
5% on James Matson, M.D.; 5% on Michelle Papo, M.D.; and 75% on Medical City Dallas
**Hospital.** Jury found Rachael **Martin's death** was a result of Medical City Dallas **Hospital**
knowingly or intentionally committing malice and that Defendants Drs. Pryor, Papo, and
Matson were subject to the control of the **Hospital.** Awarded Estate of Rachael **Martin:** $
51,600,000 Rachael's pain and mental anguish. $ 25,000 funeral expenses. $ 51,625,000
Total Award to Estate. Awarded to Brenda **Martin** and Wayne **Martin:** $ 25,000,000 loss of
companionship and society for Brenda **Martin.** $ 15,000,000 mental anguish for Brenda
**Martin.** $ 25,000,000 loss of companionship and society for Wayne **Martin.** $ 15,000,000
mental anguish for Wayne **Martin.** $ 55,000 medical expenses. $ 80,055,000 Total Award to
parents. $ 137,000,000 Punitive damages. $ 268,680,000 Total Award (with prejudgment
interest, over $ 300,000,000). 12 - 0 (8 day trial; 2 hrs. 50 mins. of deliberations) Post-trial
note: Case has settled. Amount and details of the settlement not available. Pre-trial demand:
$ 3 million Asked of jury: $ 100 million in punitive damages but no amount suggested for
other damages Pre-trial offer: $ 100,000 by **Hospital Hospital's** carrier: Self insured
Doctors' carrier: MPC

#### Disbursement: Award Total: $ 80,055,000

**Injury:** Plaintiffs, the parents of a 15-year-old minor, Rachael **Martin,** who had suffered with
cerebral palsy since birth, brought this lawsuit after she died as a result of an alleged
overdose of the prescriptive drug, Propofol. Rachael had been hospitalized on March 17, 1998
for a surgical procedure to repair a condition of subglottic stenosis, a narrowing of the
trachea (cause unknown). Post-operatively, she was transferred to Pediatric Intensive Care
Unit where she was treated by Defendants Drs. Pryor, Matson and Papo, who were
employees or agents of PediApex acting in the course and scope of their agency with
PediApex. Defendant Pryor ordered that the patient be started on Propofol via I.V. infusion.
Plaintiffs contended Rachael was given 40 times the recommended dosage of Propofol; and
as a result, she died 2 1/2 days after the surgery, on March 20, 1998. According to the
Plaintiffs' Fifth Amended Petition, the doctors through PediApex acted negligently in ordering
Propofol; failing to discontinue the infusion; failing to clinically titrate Propofol once it was
given to Rachael; failing to investigate abnormal findings in Rachael's urine; failed to

recognize an adverse reaction to Propofol; failed to properly treat her or correct the dosage; failed to adequately assess and evaluate her; and failed to maintain adequate or appropriate communication regarding her condition with the nurses and other **Hospital** employees. Against the **Hospital** (the only Defendant at trial), Plaintiffs claimed that its acts and/or omissions in its care of Rachael were negligent and constituted violations of the standard of care. They alleged: failure to follow appropriate medical practices; failure to adequately follow, evaluate, assess and respond; failure to timely and properly communicate to the attending physicians; failure to question inappropriate orders; failure to monitor Rachael's condition and timely respond to emergent condition; failure to report her abnormal urine; failure to respond to abnormal signs and symptoms, including urine, blood pressure and lab values -- Records indicated that the child's urine went from amber, to tea, to dark brown to black in color before a specimen was ever sent for analysis -- failure to timely initiate life saving measures; failure to implement policies and procedures regarding continuous monitoring of patients in the Pediatric Intensive Care Unit; failure to adequately train nurses; failure on the part of the pharmacists to properly calculate dosage of Propofol and to question the dosage. As to the Defendant Zeneca, Inc., the manufacturer of Propofol, Plaintiffs alleged breach of expressed or implied warranty as to its sale and marketing. Further, Plaintiffs asserted gross negligence and violations of the Texas Penal Code, Sec. 22.04, for knowingly or recklessly causing bodily injury to Rachael **Martin,** a disabled child. The **Hospital** argued that Rachael was not given too much Propofol and she had an idiosyncratic reaction that would have occurred regardless of the dosage.

Estate of Rachael **Martin** sought Rachael's conscious pain and suffering for 2 1/2 days where she laid suffering and could not speak to ask for help or say what was wrong before she died. According to Plaintiffs, Propofol is a general anesthetic but it is usually given along with an opiod (pain killer) because it has no analgesic properties. Rachael's surgeon ordered that she be given morphine-sulphate as needed for pain post-operatively but the nurses never gave that medication. The Estate also sought medical expenses and costs associated with Rachael's burial. Brenda **Martin,** Rachael's mother, also sought loss of companionship and society and mental anguish for the loss of her daughter in the past and future. Wayne **Martin,** Rachael's father, sought loss of companionship and society and mental anguish for the loss of his daughter in the past and future. Punitive damages were also sought.

**State:** Texas

**Court:** Dallas County District Court, 162nd

**Judge:** Bill Rhea

**Plaintiff Attorney:** Stephen F. Malouf; Malouf& Aldous; Dallas, TX (Brenda **Martin** and Wayne **Martin,** Individually and as a Representative of the Estate of Rachael **Martin,** Deceased)
Marcellene J. Malouf; Malouf& Aldous; Dallas, TX (Brenda **Martin** and Wayne **Martin,** Individually and as a Representative of the Estate of Rachael **Martin,** Deceased)
Charla G. Aldous; Malouf& Aldous; Dallas, TX (Brenda **Martin** and Wayne **Martin,** Individually and as a Representative of the Estate of Rachael **Martin,** Deceased)

**Defendant Attorney:** Mark A. Stinnett; Stinnett, Thiebaud& Remington, L.L.P.; Dallas, TX (Children's Advanced Medical Institutes, P.A., d/b/a PediApex Associates; **Columbia Hospital** at Medical City Dallas Subsidiary, L.P. d/b/a Medical City Dallas **Hospital;** James Matson, M.D., Michelle Papo, M.D.; Robert W. Pryor, M.D., and Zeneca, Inc.)
David Moore; Strasburger& Price; Dallas, TX (Children's Advanced Medical Institutes, P.A., d/b/a PediApex Associates; **Columbia Hospital** at Medical City Dallas Subsidiary, L.P. d/b/a Medical City Dallas **Hospital;** James Matson, M.D., Michelle Papo, M.D.; Robert W. Pryor, M.D., and Zeneca, Inc.)
Laura O'Hara; Strasburger& Price; Dallas, TX (Children's Advanced Medical Institutes, P.A.,

d/b/a PediApex Associates; **Columbia Hospital** at Medical City Dallas Subsidiary, L.P. d/b/a Medical City Dallas **Hospital;** James Matson, M.D., Michelle Papo, M.D.; Robert W. Pryor, M.D., and Zeneca, Inc.)

Richard Josephson; Baker& Botts; Dallas, TX (Children's Advanced Medical Institutes, P.A., d/b/a PediApex Associates; **Columbia Hospital** at Medical City Dallas Subsidiary, L.P. d/b/a Medical City Dallas **Hospital;** James Matson, M.D., Michelle Papo, M.D.; Robert W. Pryor, M.D., and Zeneca, Inc.)

Earl Austin; Baker& Botts; Dallas, TX (Children's Advanced Medical Institutes, P.A., d/b/a PediApex Associates; **Columbia Hospital** at Medical City Dallas Subsidiary, L.P. d/b/a Medical City Dallas **Hospital;** James Matson, M.D., Michelle Papo, M.D.; Robert W. Pryor, M.D., and Zeneca, Inc.)

Russell Thornton; Stinnett, Thiebaud& Remington, L.L.P.; Dallas, TX (Children's Advanced Medical Institutes, P.A., d/b/a PediApex Associates; **Columbia Hospital** at Medical City Dallas Subsidiary, L.P. d/b/a Medical City Dallas **Hospital;** James Matson, M.D., Michelle Papo, M.D.; Robert W. Pryor, M.D., and Zeneca, Inc.)

**Plaintiff Experts:** Dan Levin, M.D.; Pediatrics

**Defendant Experts:** Fernando Stein, M.D.; Pediatrics
James Matson, M.D.; Pediatrics

**Insurance: Hospital's** carrier: Self insured
Doctors' carrier: MPC

**Issue:** VOLUME F:00:06812

Source: Legal > States Legal - U.S. > Texas > Jury Instructions & Verdicts > $ TX Jury Verdicts & Settlements, Combined 🖼
Terms: **martin columbia hospital death** (Edit Search)
View: Full
Date/Time: Monday, November 8, 2004 - 5:30 PM EST

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

**EXHIBIT 9**





## Medical Malpractice

### Estate blamed child's death on failure to monitor antibiotic dose

**Verdict:** $30,000,000.00

**Case Type:** Prescription and Medication, Medical Malpractice - Negligent Treatment, Medical Malpractice - Failure to Communicate, Medical Malpractice - Nurse

**Case:** Christina Marie Wallace, as personal representative of the Estate of Nathan Oliver Swilley, deceased v. Vivek S. Desai, Ayodeji B. Otegbeye and Central Florida Pediatric Intensive Care Specialists, Florida Hospital and Children's First Home Health Care, No. CI002-2410

**Venue:** Orange County Circuit Court, FL

**Judge:** Donald E. Grincewicz

**Date:** 07-29-2004

PLAINTIFF(S)

**Attorney:**

- Anthony J. Caggiano; Ward & Caggiano P.A.; Orlando, FL, for Estate of Nathan Oliver Swilley

**Expert:**

- Daniel Levin M.D.; Pediatric Critical Care; Hanover, NH called by: Anthony Caggiano
- Steven Alexander M.D.; Nephrology; Palo Alto, CA called by: Anthony Caggiano
- Allison Brent M.D.; Nephrology; St. Petersburg, FL called by: Anthony Caggiano

DEFENDANT(S)

**Attorney:**

- Juan Ruiz; Rissman, Weisberg, Barrett, Hurt, Donahue & McLain; Orlando, FL, for Dr. Ayodeji B. Otegeye, Dr. Vivek S. Desai, Central Florida Pediatric Intensive Care Specialists
- Name withheld; null, null, for Florida Hospital, Children's First Home Health Care
- Vance R. Dawson; Rissman, Weisberg, Barrett, Hurt, Donahue & McLain; Orlando, FL, for Dr. Ayodeji B. Otegeye, Dr. Vivek S. Desai, Central Florida Pediatric Intensive Care Specialists

**Expert:**

- Albert Saltiel M.D.; Pediatric Critical Care; St. Petersburg, FL called by: Vance Dawson,Juan Ruiz, Name withheld

FACTS:



On April 14, 2001, plaintiff's decedent Nathan O. Swilley, 10, stepped on a nail in his yard. His mother, Christina Wallace, took him to Florida Hospital in Apopka on April 15 and 17. His wound was cleaned and treated on both visits and he was sent home each time.

On April 18, Nathan was seen by orthopedic surgeon Adam Fenichel, who recommended admission to Florida Hospital in Orlando for surgical debridement of the wound and for antibiotic treatment. Fenichel referred the child to Dr. Vivek S. Desai for admission.

On April 25, Nathan was discharged and Desai and Dr. Ayodeji B. Otegbeye prescribed the IV antibiotics Gentamicin, Zosyn and Motrin to treat his foot infection. Otegbeye ordered home health care nursing to come to Nathan's house to administer the antibiotics. The order was arranged and managed by Florida Hospital of Orlando and Children's First Home Health Care, Orlando. These IV antibiotics have the potential to cause liver and kidney damage and the blood needs to be monitored carefully for signs of toxicity. However, Nathan's blood was never monitored. (Nathan had blood level monitoring on April 20 and it showed his Gentamicin level to be on the low therapeutic range.) At the time of discharge, Otegbeye was not informed that the home healthcare nursing would not be going to Nathan's home on a daily basis. This information was not made available to Otegbeye until after Nathan was readmitted to Florida Hospital on May 8.

At the April 25 discharge, Wallace was instructed to return to Otegbeye's office in one week for a follow-up visit, at which time Nathan would undergo drug-level monitoring. Wallace never made an appointment for this visit. She testified that she "forgot" to make the appointment.

On May 5, Nathan suffered from a high fever, vomiting and diarrhea. On May 6, Wallace called Desai, who told her that the symptoms sounded like the flu, but that if Nathan felt no better in two to four hours, she was to bring him to the emergency room. Also, Desai told her that Nathan was to be seen the next morning for lab work. This order is referenced in medical records.

Wallace claimed to have called Otegbeye and Desai's office on May 7, but that no one returned her call. At deposition and trial, Wallace testified that she could not recall whom she called or that it was even the correct number. Further, despite claiming to have called once at 8 a.m., Wallace never attempted a repeat call to any healthcare provider that day. Also on that day, a home healthcare nurse told Wallace that Nathan needed to be seen by a pediatrician because something was apparently wrong with him. Despite this instruction, Wallace did not take Nathan to any healthcare provider until May 8.

On the morning of May 8, Wallace took Nathan to his pediatrician, who told her that Nathan needed to be readmitted to the hospital. The pediatrician called Otegbeye, who said the child needed to be readmitted to the hospital at that time (May 8). Wallace claimed that she informed personnel at the pediatrician's office that she needed to make arrangements for the care of her other children once they got out of school for the day before she could bring Nathan to the hospital. She never told Desai or Otegbeye that she could not go directly to the hospital. Wallace could not recall who she told that she could not bring Nathan in right away.

Wallace did not arrive at Florida Hospital with Nathan until 9:40 p.m. that night. (Wallace claimed that she was never told that she needed to go to the hospital immediately.)

At that time, Nathan was readmitted and treated by Otegbeye. His kidneys were failing. It was confirmed that he had renal failure. Otegbeye consulted Dr. Abdollah Iravani, a pediatric nephrologist, to arrange for treatment. Iravani decided to perform hemodialysis to treat Nathan's kidneys. As a result of using hemodialysis, Nathan developed dialysis disequilibrium syndrome (DSS), causing his brain to swell and death.

Wallace, as personal representative of Nathan's estate, sued Children's First Home Health Care; Florida Hospital; Desai; Otegbeye; and their practice, Central Florida Pediatric Intensive Care Specialists, Orlando.

Wallace claimed that Florida Hospital of Orlando and Children's First, both of which arranged and managed Nathan's care, were negligent for failing to monitor the doses and the blood levels. The claims against Children's First and Florida Hospital were settled for undisclosed amounts several months before trial.

She claimed that Desai and Otegbeye were negligent for prescribing the antibiotics and failing to monitor the doses and blood levels for possible kidney and liver toxicity.

At trial, plaintiff expert nephrologist Steven Alexander testified that as a direct result of Iravani's choice of hemodialysis, Nathan developed DDS. Alexander further testified that he, Alexander, would not have used hemodialysis and instead would have used Continuous Renal Replacement Therapy, a less drastic version of dialysis. Alexander testified that if CRRT had been used in this case by Iravani, Swilley would not have died. Further, once Iravani became aware that Nathan had begun to suffer from DDS, he changed the treatment and used CRRT. It was undisputed at trial that Iravani's treatment choices were the direct cause of Nathan's death.

The defense for Desai and Otegbeye argued that Wallace was at fault for not bringing Nathan to the hospital earlier than the May 8 date. It also claimed that she was negligent for missing the one-week follow-up visit with the doctors after Nathan's original discharge on April 25, and therefore they could not be held responsible for the excessive dosages. It further contended that the doctor at the family clinic was also at fault for not having Nathan sent from the clinic to the hospital in an ambulance.

The plaintiffs' experts could not provide a reasonable explanation for Wallace's failure to bring her son to the follow-up appointment or for waiting 9.5 hours before bringing him back to the hospital. Further, plaintiff expert Daniel Levin testified that if he had been caring for his own child, he would have made

Daily Updates - VerdictSearch

and kept the one week-follow up appointment.

INJURY:

Wallace did not claim economic damages. She claimed past and future pain and suffering for the loss of her 10-year-old son.

The defense contended that the plaintiff failed to present any evidence on the issue of life expectancy of either Nathan or his mother. It was not until the defense moved for directed verdict on this issue that the plaintiff, over strong objection, was allowed to reopen her case to present this evidence.

VERDICT INFORMATION:

The jury found Otegbeye 59% at fault, Desai 33% at fault and Children's First Home Health Care 8% at fault. It found $30 million in damages, which was reduced to $27.6 million as per the fault apportionment. Otegbeye is responsible for $17.7 million; Desai is responsible for $9.9 million.

**Estate of Nathan Oliver Swilley**

$4,000,000 Personal Injury: Past Pain And Suffering

$26,000,000 Personal Injury: Future Pain And Suffering

Copyright © 2004 ALM Properties. Inc. All rights reserved. Terms & Conditions. Privacy Policy————| Help Desk | About Us | Site Map | Pressroom

**EXHIBIT 10**



American Lawyer Media's LAW.COM

SVERDICTSEARCH



## CASE REPORT

## Products Liability

### Air conditioning unit sparked blaze that left boy dead

**Verdict:** $34,010,000.00

**Case Type:** Appliances, Wrongful Death - Survival, Products Liability - Design Defect, Affirmative Defenses - Contributory Negligence

**Case:** Monica Ibarra, individually and as representative of the Estate of Adan Ibarra, and Manuel Alvarez, Hermalinda Alvarez, Manuelito Alvarez v. L.G. Electronics Inc., No. C-1077-03-F

**Venue:** Hidalgo County District Court, 332nd, TX

**Judge:** Mario E. Ramirez, Jr.

**Date:** 11-01-2004

PLAINTIFF(S)

**Attorney:**

- Roger S. Braugh Jr.; Sico, White & Braugh; Corpus Christi, TX, for Estate of Adan Ibarra, Monica Ibarra, Hermalinda Alvarez, Manuel Jr. Alvarez, Juanita Alvarez
- Jose Chapa; Law Offices of Yzaguirre & Chapa; McAllen, TX, for Estate of Adan Ibarra, Monica Ibarra, Hermalinda Alvarez, Manuel Jr. Alvarez, Juanita Alvarez
- Craig M. Sico; Sico, White & Braugh; Corpus Christi, TX, for Estate of Adan Ibarra, Monica Ibarra, Hermalinda Alvarez, Manuel Jr. Alvarez, Juanita Alvarez

**Expert:**

- Joseph Burton M.D.; Forensic Pathology; Alpharetta, GA called by: Roger Braugh
- George Barnes ATF; Cause & Origin; Beaumont, TX called by: Roger Braugh
- Judd Clayton; Engineering; Dickinson, TX called by: Roger Braugh
- Sandra Lopez LMSW/ACP; Psychology/Counseling; Houston, TX called by: Roger Braugh
- Rex Mclellan; Metallurgical Testing; Houston, TX called by: Roger Braugh
- Vytenis Babrauskas; Fires & Explosions; Issaquah, WA called by: Roger Braugh
- Cory Martin; Cause & Origin; League City, TX called by: Roger Braugh
- Lloyd Young; Fires & Explosions; League City, TX called by: Roger Braugh

DEFENDANT(S)

**Attorney:**

- Craig M. Sico; Sico, White & Braugh; Corpus Christi, TX, for Times Square Partners L.L.C., Otis Elevator Co., Grandboro Arms, L.P., Alex Joanow, Donald DeBrakeleer, L.G. Electronics Inc.
- David H. Crago; Brin & Brin, P.C.; Corpus Christi, TX, for L.G. Electronics Inc.
- Gabriella S. Canales; Law Office of Gabriella S. Canales, P.L.L.C.; Alice, TX; for L.G. Electronics Inc.
- John R. Lyde; Brin & Brin; Edinburg, TX, for L.G. Electronics Inc.

National - Newsletter - News - VerdictSearch



**Expert:**

- Jack Yates; Cause & Origin; Broken Arrow, OK called by: David Crago,John Lyde
- Michael Klassen; Cause & Origin; Columbia, MD called by: David Crago,John Lyde
- Linda Norton M.D.; Pathology; Dallas, TX called by: David Crago,John Lyde
- Johnny Thornton; Cause & Origin; Houston, TX called by: David Crago,John Lyde
- Charles Wilkie; Chemistry; Milwaukee, WI called by: David Crago,John Lyde
- Clifford Bigekow; Metallurgy; O'Fallon, MS called by: David Crago,John Lyde
- Ronald Rhoten; Engineering; Stillwate, OK called by: David Crago,John Lyde

## INSURER:

- St. Paul for L.G. Electronics

## FACTS:

On May 8, 2003, at about 11 p.m. on Chapa Road in Weslaco, a fire broke out in a trailer home occupied by the Ibarra family. Monica Ibarra, 29, and her four minor children, Adan, Hermelinda, Manuelito and Juanita, ages 9, 7, 4 and 2 respectively, initially escaped from the home without incident. Ms. Ibarra ran to a neighbor's home to call for help, and when she returned, she noticed that Adan was missing. Hermelinda confirmed that Adan had called his mother's name, and then reentered the burning home. By the time Monica and neighbors returned, they could see Adan laying down in the living room through a window, but could not reach him due to the heat, flames and smoke. The fire consumed the home and Adan's body before rescue personnel arrived.

County fire officials determined that the fire was accidental and placed the likely origin on the north wall of the living room, near a window where an air conditioning unit was mounted.

After 12 days of scene investigation by plaintiffs' fire cause and origin experts, weeks of evidence exams at Anderson Laboratories in Houston, extensive laboratory testing and UL 94 testing conducted at Southwest Research Institute in San Antonio, plaintiffs determined that the origin of the fire was the LG Electronics window air conditioning unit, a Goldstar Model M 1203 R.

Monica Ibarra and her family sued LG Electronics in products liability for the wrongful death of Adan Ibarra. They claimed that the air conditioner was defectively designed and as a result, it ignited and cause the fatal fire.

The plaintiffs contended that the LG electronics window air conditioning unit caught fire due to a failed compressor run capacitor, which caused excessive current to reach the compressor relay and overheat. They argued that the excessive current was allowed to reach the compressor relay due to a fused or otherwise defective overload protection device. The heat generated from the compressor relay thereafter ignited excessively flammable plastic materials, and the fire spread outside of the metal control box to other flammable plastics in the air conditioner.

The Ibarras alleged that this model air conditioner utilized an under-rated compressor relay and relay terminal connections that were not capable of safely withstanding excessive current without overheating.

The plaintiffs' proof at trial included evidence from eyewitnesses and experts who placed the fire origin at the window air conditioner unit and excluded other potential origins. Their cause and origin expert also placed the origin specifically in the control box area on the lower right hand side of the air conditioner, where the electrical components were housed.

The Ibarras presented testimony and documentary evidence at trial that LG had a history of compressor relay overheating problems. Plaintiffs also produced documents alleging that LG had instituted cost cutting measures in 2000 for products bound for the U.S. market as 2001 models. One of the cost cutting measures was a 45% reduction in the silver coating that was used on the compressor relay contacts, which served to prevent the unit from overheating.

The plaintiffs also contended that certain plastic components were excessively flammable and that some did not comply with UL 484, the Underwriters Laboratory standard for room air conditioners. Evidence was presented at trial that LG had actual knowledge of these design flaws but failed to fix them.

LG Electronics denied these allegations and contended that the origin of the fire was in the adjacent kitchen, where a gas range was located. LG also contended that at least one of the range burners was found in the open position after the fire.

LG also argued that the compressor relay was redesigned in 1998, that the subject unit was produced in 2001, and that there had been no incidents of relay overheating since 1998. LG also denied the safety allegations made against it by asserting that its unit utilized materials that were standard across the window air conditioning unit industry.

LG further claimed that, based upon some witness statements obtained by the fire marshall and deputy sheriff, that Monica Ibarra was herself negligent because she left her children in the living room when she ran for help.

National - Newsletter - News - VerdictSearch

## INJURY:

Adan Ibarra died in the blaze. An autopsy revealed that Adan's carbohemoglobin level was 77% and confirmed that his cause of death was carbon monoxide poisoning. Minor thermal injuries prior to death could not be ruled out.

LG contended that Adan Ibarra was likely asleep in the living room, on the couch where his body was found, prior to the fire and that he inhaled a lethal dose of carbon monoxide as he slept.

Monica Ibarra was treated and released for smoke inhalation, lacerations from breaking windows out with her hands and arms, and some thermal burns on her fingers.

## VERDICT INFORMATION:

The jury found that the Goldstar M 1203 R was unreasonably dangerous and defective in design and that LG failed to utilize economically and technologically feasible safer alternative designs that would have prevented or significantly reduced the risk of the fire for consumers. The jury also found that the unit suffered from manufacturing defects that rendered it unreasonably dangerous and defective.

The jury did not find any contributory negligence on behalf of Monica Ibarra. They also found by the criminal burden of proof, "beyond a reasonable doubt", that the conduct of LG Electronics amounted to malice and that LG had actual, subject awareness of an extreme degree of risk presented by its product, but was consciously indifferent to the rights, welfare and safety of others.

Plaintiffs sought an unspecified amount of damages. The jury awarded a total of $34,010,000 in actual damages. They awarded $20,010,000 to Monica Ibarra, $10,000,000 to Hermalinda, $3,000,000 to Adan's estate for his conscious pain and suffering prior to death, and $500,000 each to Manuelito, Jr. and Juanita. In Texas, the defendant has a right to bifurcate the punitive damage aspect of a trial which calls for liability to be established before evidence, such as a company's net worth, can be introduced in support of a punitive award.

This trial was bifurcated and the jury did find that defendant was also liable for punitive damages but the defendants settled the punitive damage phase for a confidential amount prior to punitive damage evidence being introduced.

Attorney for the plaintiff, Roger S. Braugh, Jr. said, "This is a prime example of how product manufacturers will design the cheapest product for market in order to maintain their market share. It is our sincere hope that this case and unfortunately, others like it, will force the redesign of dangerous products in the market that inadequate government regulations and standards allow to be sold in the United States."

Plaintiff's co-counsel Craig M. Sico added "LG traded profits for safety. They had the technology to build a better product, but chose not to utilize it. We hope this case sends a clear message to the industry so that other families will not suffer like the Ibarras."

Copyright © 2004 ALM Properties, Inc. All rights reserved. Terms & Conditions. Privacy Policy——————| Help Desk | About Us | Site Map | Pressroom